United States Courts
Southern District of Texas
ENTERED

APR 0 1 2005

Michael N. Milby, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE CORNELL COMPANIES, INC. SECURITIES LITIGATION | § §  CIVIL ACTION NO. H-02-0866 §  § §  <u>CLASS ACTION</u> |

## O R D E R

Pending before the Court are Defendants Cornell Companies Inc. and John L. Hendrix's Motion to Dismiss **(Instrument No. 65)** and Defendant Steven W. Logan's Motion to Dismiss **(Instrument No. 67)**.

### I.

The case before the Court is a class action suit for violations of the federal securities laws. (Instrument No. 59, at 1). The suit is brought on behalf of purchasers of the common stock of Cornell Companies, Inc. ("Cornell" or the "Company") between March 6, 2001 and March 5, 2002 (the "Class Period"). (*Id.*). Included in the class are purchasers who bought Cornell stock in the Company's second offering in November 2001 ("the Secondary Offering"). (*Id.*). The claims asserted in the suit arise under §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a); under Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC"), codified at 17 C.F.R. § 240.10b-5; and under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), codified at 15 U.S.C. §§ 77k and 77o. (*Id.*, at 4).

Lead Plaintiff is Flyline Partners L.P. ("Lead Plaintiff" or "Flyline"), which purchased common stock of Cornell "at artificially inflated prices during the Class Period." (*Id.*, at 5). Plaintiff

Richard Picard ("Picard") purchased Cornell stock "in and traceable to the Company's Secondary Offering" on or about November 26, 2001. (*Id.*). Plaintiff Anthony J. Scolaro ("Scolaro") purchased Cornell stock during the Class Period. (*Id.*). The rest of the class is made up of purchasers of Cornell common stock during the Class Period, both known and unknown at the current time. (*Id.*, at 9).

Defendant Cornell is a Delaware corporation and is a "provider of privatized correctional, detention and pre-release services to governmental agencies." (*Id.*, at 1, 5). Cornell "provides facility development, design, construction and operational services to government agencies within three operating divisions: adult secure institutional correctional and detention services; juvenile treatment, educational and detention services; and pre-release correctional and treatment services." (*Id.*, at 1).

Defendant Steven W. Logan ("Logan") was Chief Executive Officer ("CEO") and President of Cornell until September 2002. (*Id.*, at 5). Plaintiffs allege that Logan is a certified public accountant ("CPA") who served "in various positions" at Arthur Andersen LLP ("Arthur Andersen") from 1984 to 1993. (*Id.*). Plaintiffs allege that Logan "signed the false and misleading SEC filings described [in the First Amended Consolidated Complaint]." (*Id.*). Defendant John L. Hendrix ("Hendrix") was the Chief Financial Officer ("CFO") of Cornell during the Class Period. (*Id.*). Plaintiffs claim that Hendrix, too, is a CPA and has served as the CFO of other publicly-traded companies. (*Id.*). Plaintiffs allege that Hendrix "signed the false and misleading SEC filings described [in the First Amended Consolidated Complaint]." (*Id.*). Logan and Hendrix are referred to by the parties and this Court as the "Individual Defendants."

2

This suit was originally filed on March 7, 2002. (Instrument No. 1). On May 24, 2002, the case was consolidated with several other pending cases. (Instrument No. 17). This Court granted the motion to appoint Flyline as Lead Plaintiff on February 13, 2003. (Instrument No. 28). Plaintiffs' Consolidated Complaint was then filed on March 17, 2003. (Instrument No. 29). On October 30, 2003, the Court granted Plaintiffs' motion to amend their complaint, and the First Amended Consolidated Complaint was filed. (Instruments No. 58 and No. 59).

In the First Amended Consolidated Complaint (the "Complaint"), Plaintiffs state three claims for relief. (Instrument No. 59, at 54-60). First, Plaintiffs allege violations of Section 10(b) of the Exchange Act and Rule 10b-5, against all Defendants. (*Id.*, at 54). Second, Plaintiffs allege violations of Section 20(a) of the Exchange Act, against all Defendants. (*Id.*, at 57). Third, Plaintiffs allege violations of Sections 11 and 15 of the Securities Act, against all Defendants. (*Id.*, at 58). Plaintiffs clarify that this third claim is "on behalf of Plaintiff Picard and the offering subclass." (*Id.*). Plaintiffs seek certification of their class pursuant to Rule 23 of the Federal Rules of Civil Procedure. (*Id.*, at 60). In addition, they seek restitution of investors' monies, compensatory damages, rescission or a rescissory measure of damages, reasonable costs and expenses, attorneys' fees. (*Id.*).

In the Complaint, Plaintiffs allege the following facts in support of their claims. Plaintiffs claim that, during the Class Period, Defendants "issued materially false and misleading statements regarding the amount of Cornell's balance sheet debt and two complicated financing transactions which had purportedly permitted the Company to eliminate nearly $250 million of debt from its financial statements through the use of unrelated special purpose entities ("SPEs")." (*Id.*, at 1). Plaintiffs allege that, because of these misstatements, the investors in the Company were misled

3

about Cornell's existing debt and leverage, "including its ability to obtain additional financing necessary to compete for new government prison contracts, construct new prisons for contracts it had already obtained, and its compliance with debt covenants on its senior loans." (*Id.*).

Plaintiffs assert that the Company's stock was artificially inflated by these false statements, climbing from $7.65 per share at the beginning of the Class Period to $18.40 per share. (*Id.*). Plaintiffs claim, "Cornell took advantage of this artificial inflation, selling 3.45 million shares of Cornell stock at $14.00 per share in a Secondary Offering . . . and obtaining proceeds of over $48 million." (*Id.*). This Secondary Offering "was accomplished pursuant to a Prospectus Supplement dated November 27, 2001, which was issued in conjunction with a Shelf Registration Statement filed on November 18, 2001." (*Id.*, at 1-2). Plaintiffs contend that Logan and Hendrix received cash bonuses based on Cornell's "supposedly successful results in 2001 and were beneficiaries under a new deferred bonus plan due to the transactions which falsified Cornell's financial statements." (*Id.*, at 2).

Two controversial transactions form the core of this lawsuit: a synthetic lease transaction that was executed in 2000, and a sale/leaseback transaction that was executed in August 2001. Plaintiffs allege that, by 2000, "Cornell had grown to the fourth largest company in the private corrections industry as it had acquired numerous prisons, halfway houses and juvenile detention facilities. The large number of acquisitions left Cornell deeply in debt." (*Id.*, at 12). Plaintiffs allege, further, that on March 31, 2000, Cornell's debt-to-equity ratio was 2.71, while the ratios of its "closest competitors" was "just 0.18 and 0.79, respectively." (*Id.*). Plaintiffs contend, therefore, that Cornell was in a crisis and that its "existing credit facilities were close to being maxed out." (*Id.*)(emphasis omitted). In addition, Plaintiffs allege that, by June 30, 2000, Cornell was about to breach both of

4

its debt covenants, which limited the ratio of debt to "Earnings Before Interest, Depreciation, Taxation and Amortization" ("EBITDA"). (*Id.*, at 13).

Plaintiffs allege that "[t]o alleviate these problems, Logan and Hendrix worked to move debt off of the Company's balance sheet through two creative accounting schemes: a renegotiation of its existing long-term debt, including an expansion of its off-balance sheet 'synthetic lease' agreement . . . and a 'sale/leaseback' agreement to eliminate massive balance sheet debt the Company had incurred in constructing 11 prisons to operate under government contracts." (*Id.*).

> The alleged facts surrounding the Synthetic Lease Transaction are as follows.
> On August 1, 2000, Cornell announced that it had restructured its long-term debt so that it could pay off its short-term bridge loan and address its working capital deficit, including by increasing its synthetic lease financing to $100 million. Under the synthetic lease, SunTrust Equitable Securities Corporation ("SunTrust") and other lenders agreed to provide up to $100 million in loans to finance new prison acquisistions. The loans were to be provided to a SunTrust subsidiary, Atlantic Financial Group, Ltd. ("Atlantic"), which would use the proceeds to purchase property and build the prison, using Cornell as its construction agent. The finished prison would then be leased back to Cornell.

(*Id.*, at 14). Under this financing structure, Atlantic was "required to be treated as a 'virtual SPE,'" or virtual special purpose entity, which meant that it was "required to maintain a 3% equity ownership interest in prisons financed through this arrangement throughout the life of the lease." (*Id.*). Plaintiffs allege that "[b]ecause Atlantic was a subsidiary of SunTrust, Generally Accepted Accounting Principles ("GAAP") required that any payments to SunTrust be treated as a return of Atlantic's capital investment, and taken into account in determining whether Atlantic was maintaining the required 3% interest." (*Id.*). If Atlantic's interest fell below 3%, the transaction would not qualify for off-balance sheet treatment, and Cornell's "loan obligations would have to be

consolidated with and reported on Cornell's balance sheet, since GAAP requires that an SPE be demonstrably distinct from the Company." (*Id.*).

Plaintiffs allege that the "length and complex agreements" involving Cornell, SunTrust, Atlantic, and other lenders were "negotiated and arranged by Logan, and signed by Hendrix." (*Id.*). Plaintiffs allege that, because of "the synthetic lease transaction and related debt reduction efforts," the Company's "debt-to-equity ratio appeared to have shrunk to below 1.5" by the end of 2000. (*Id.*, at 15). That ratio was a "dramatic decline" from the previous ratio, and it appeared lower than that of "one of its closest competitors . . . whose debt-to-equity ratio had ballooned to 1.65 at the end of 2000." (*Id.*, at 15-16). Plaintiffs allege that, "[h]ad the synthetic lease been consolidated on Cornell's balance sheet, as required by GAAP, investors would have learned that Cornell's debt to equity ratio was, in reality, 1.86." (*Id.*, at 16). In addition, Plaintiffs allege that, had the synthetic lease transaction been consolidated onto the balance sheet, Cornell's debt ratios would have been in violation two debt covenants on $50 million in Senior Secured Notes that Cornell had issued in 1998. (*Id.*, at 13, 16).

The second transaction at the center of this case is the Sale/Leaseback Transaction of August 2001. "The sale/leaseback involved an effort by Cornell to 'sell' 11 prisons to an SPE it was attempting to form, using the proceeds from the transaction to pay off the debt associated with those facilities." (*Id.*, at 17). The SPE involved was called Municipal Corrections Finance, L.P. ("MCF"), which Cornell stated in a press release on February 6, 2002 was "unaffiliated with Cornell and headquartered in Baton Rouge, La." (Instrument No. 59, at 2). Plaintiffs allege that the SPE "would then lease the prisons back to Cornell, so that it could continue providing services at those facilities under its government prison contracts. While the lease payments would show up as annual operating

expenses on Cornell's financial statements, the debt associated with those facilities would not." (*Id.*, at 17). Plaintiffs allege that an anonymous former Cornell executive, "who was personally involved in the negotiations with the potential investors in that transaction, said the whole focus of the transaction was to keep debt off of Cornell's books and to address its 'desperate' need for cash." (*Id.*). Plaintiffs allege that this same executive "said that Logan was also personally involved in the sale/leaseback negotiations and appeared to be 'very familiar' with the accounting requirements of such off-balance sheet transactions." (*Id.*).

According to the agreement, Cornell sold eleven prisons to MCF, an entity which Plaintiffs allege "had been established specifically for the sale/leaseback transaction." (*Id.*, at 18). "MCF then leased the prisons back to Cornell for an initial 20-year term at fixed, non-escalating rates, and granted Cornell an option to extend the leases for up to an additional 25 years, also at pre-determined fixed rental amounts." (*Id.*). Plaintiffs allege the following with regard to the financial implications of this sale/leaseback transaction:

> Cornell received net proceeds of $178 million from the sale/leaseback transaction, of which $120 million was used to retire long-term debt, including $50 million to pay off its Senior Secured Notes. At the time of this repayment, Cornell was already in serious breach of the debt covenants in the notes . . . . The remaining $70 million obtained under the sale/leaseback was used to pay of its revolving line of credit. As a result of these transactions, Cornell reported that it had just $38.4 million of long-term debt on its balance sheet, reducing its debt to equity ratio to 0.35.

(*Id.*).

Plaintiffs contend that this transaction, like the synthetic lease transaction, violated GAAP, however, because MCF's debt–incurred by issuing bonds to make the purchase of the prisons–should have been consolidated on Cornell's balance sheet. (*Id.*, at 18-19). "GAAP required that entities that were independent from Cornell maintain an equity stake of at least 3% in the prisons throughout

7

the life of the leases. . . . In an attempt to qualify the transaction for off-balance sheet treatment, Logan convinced Lehman Brothers to make a 3% equity investment in MCF." (*Id.*, at 19). The problem with the transaction, according to Plaintiffs' allegations, stems from "a side deal" Logan had allegedly negotiated "whereby Cornell paid Lehman Brothers $3.5 million to reimburse it for its equity investment, disguising the kickback as a non-refundable 'retainer' for services which had not been, and never had to be, performed." (*Id.*). Plaintiffs allege that this agreement was commemorated in a letter Logan sent to David Lavelle of Lehman Brothers on September 5, 2001 ("the Logan/Lehman letter"). (*Id.*). Plaintiffs claim that the "letter was signed by Logan and countersigned by Lavelle. Neither the letter nor any description of its terms was publicly disclosed during the Class Period." (*Id.*).

The final pieces in Plaintiffs' suit are Cornell's Secondary Offering and its financial restatement. On October 30, 2001, Cornell announced a public offering of up to 3,450,000 newly-issued shares of common stock. Plaintiffs allege that "[t]o make this Offering successful, it was important that Cornell report favorable results and portray a strong balance sheet." (*Id.*, at 22). Plaintiffs further allege that, "[i]n a Prospectus Supplement for the Offering, Cornell claimed that most of its long-term debt had been eliminated through the just- completed sale/leaseback transaction, and said the Offering proceeds would be used to retire its remaining long-term debt." (*Id.*). The Secondary Offering commenced on November 27, 2001 and was completed on or about November 30, 2001. (*Id.*, at 23). The net proceeds were $48.3 million, $40 million of which was used to pay off Cornell's long-term debt. (*Id.*).

The final piece of the suit is Cornell's restatement of its finances. Plaintiffs allege that Cornell's balance sheet during the Class Period understated the Company's long-term debt by $45

million in 2000 and by $238 million in September 2001. (*Id.*, at 2). Plaintiffs state that on "February 6, 2002, the Company stunned the market when it issued a press release entitled, 'Cornell Reviews Sale/Leaseback Transaction.'" (*Id.*). The press release stated that the Company had formed a Special Committee of its Board of Directors "to review the accounting for its August 2001 sale/leaseback transaction." (*Id.*). Specifically, the inquiry focused on "whether the retainer agreement affect[ed] the previously reported accounting treatment for the August 2001 sale/leaseback transaction, and whether the amount paid the Investment Bank was appropriately reflected in the Company's financial statements." (*Id.*). The press release stated further,

> The sale/leaseback transaction involved a special purpose entity, Municipal Corrections Finance, L.P. ("MCF"), unaffiliated with Cornell and headquartered in Baton Rouge, La. The Investment Bank affiliates are the sole equity owners of the special purpose entity. The Special Committee is reviewing whether, as an accounting matter, the retainer amount paid by Cornell to the Investment Bank would reduce the previously established equity of the Investment Bank affiliate in the special purpose entity.
>
> If equity were reduced below required levels, the effect would have material financial consequences, including requiring the consolidation of MCF's assets, liabilities and results of operations in Cornell's financial statements beginning in the 3rd quarter of 2001. In that event, Cornell's balance sheet would include the book value of the leased properties as an asset and the outstanding debt of MCF as a liability. Further, although consolidation would not have an effect on the Company's actual net cash flow, results of operations would be negatively impacted to the extent that interest on the MCF debt and depreciation on the facilities exceeded rental expenses recorded by Cornell with respect to the leased facilities.

(*Id.*). Plaintiffs allege that, in response to the press release, Cornell's stock dropped to $6.50 per share, before closing at $9.96 per share on February 6, 2002. (*Id.*, at 3). Plaintiffs claim that this closing price was "45% below the Class Period high of $18.40 per share and a one-day drop of 43%." (*Id.*).

Cornell issued a second press release on March 6, 2002, entitled "Cornell Companies Inc. to Restate Its Financials for Year Ended December 31, 2000 and Subsequent Quarters." (*Id.*). The press release announced that Cornell would restate its financial statements for the fiscal year ended December 31, 2000 and its financial statements for the quarters ended March 31, 2001, June 30, 2001, and September 30, 2001. (*Id.*). The press release explained that the Special Committee had reviewed the August 2001 sale/leaseback transaction as well as the 2000 synthetic lease transaction. (*Id.*). The restatement of financial statements "relate[d] to the Company's review of the interpretation of complex accounting rules for the required equity investments in special purpose entities relevant to the Company's August 2001 sale/leaseback transaction and the Company's 2000 synthetic lease transaction." (*Id.*). The Company announced in the press release that it had decided to make the restatement "in view of anticipated changes in accounting rules governing these types of transactions and the desire to reach a final resolution of these matters as quickly as possible." (*Id.*).

The Chairman of the Board, Harry J. Phillips, Jr., was quoted in the press release, stating, "'In today's market, we believe that the consolidated accounting treatment for the two transactions provides for greater transparency in our financial statements. Other than an equipment sale/leaseback for approximately $10 million, we have no other off balance sheet arrangements. Importantly, the consolidated accounting will not impact our current or future cash flow.'" (*Id.*). The balance of the press release stated,

> The consolidation of the assets and liabilities from the August 2001 sale/leaseback transaction onto the Company's financial statements is expected to have a non-cash reduction of up to $0.05 on diluted earnings per share for the nine months ended Sept. 30, 2001. In addition, this consolidation is expected to result in an increase in

the combined total assets and liabilities of the Company by approximately $198 million and $199 million, respectively, as of Sept. 30, 2001.

The consolidation of the assets and liabilities from the 2000 synthetic lease transaction onto the Company's financial statements is expected to have no impact on earnings per share for 2000 and is expected to have a non-cash reduction of $0.01 diluted earnings per share for the nine months ended Sept. 30, 2001. In addition, this consolidation is expected to result in an increase in the combined total assets and liabilities of the Company by approximately $45 million as of Dec. 31, 2000 and by approximately $48 million as of Sept. 30, 2001.

(*Id.*, at 3-4).

Plaintiffs allege that "the Company's shares plummeted by more than 10%" after the second press release was issued. (*Id.*, at 4). Plaintiffs contend, further, that "in May 2002, Cornell filed its Report on Form 10-K for FY01, including therein a restatement of its results for 2000 and its first three quarters of 2001. The restated financial statements included hundreds of millions of dollars of debt the Company had not previously included in its balance sheets." (*Id.*).

On May 5, 2004, Defendants Cornell and Hendrix filed their Motion and Brief in Support of Motion to Dismiss First Amended Consolidated Complaint. (Instrument No. 65). Cornell and Hendrix assert seven arguments in favor of granting the dismissal of the Complaint. First, they argue that the Complaint fails to provide the particularity of pleading that is required by the Private Securities Litigation Reform Act ("PSLRA"). (*Id.*, at 2). In support of this first argument, Cornell and Hendrix contend that the Fifth Circuit "categorically rejects 'group pleading,'" that Plaintiffs "cannot generically plead based on information and belief," that Plaintiffs fail to provide the required specificity for confidential witnesses, and that Plaintiffs fail to plead the required specificity for each alleged false or misleading statement. (*Id.*, at 2-5).

Second, Cornell and Hendrix argue that the Complaint should be dismissed because Plaintiffs have failed to "adequately plead scienter." (*Id.*, at 11). They contend that Plaintiffs have not met the statutory requirement of the PSLRA, including specific facts giving rise to a strong inference of either intentional misconduct or recklessness. (*Id.*). Cornell and Hendrix argue that Plaintiffs have failed to show that Defendants committed an "'extreme departure from the standard of ordinary care . . . that present[ed] a danger of misleading buyers or sellers which is either known to the Defendant or is so obvious that the Defendant must have been aware of it.'" (*Id.*)(quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).

Third, these Defendants argue for dismissal based on the Plaintiffs' failure to satisfy the pleading burden required for alleged GAAP violations. (*Id.*, at 14). Cornell and Hendrix argue that "GAAP violations are the only claims [P]laintiffs attempt to plead in their amended complaint. But [P]laintiffs fail to properly assert even these insufficient scienter allegations. Rather than directly alleging a GAAP violation, [P]latiniffs improperly ask the Court to assume one occurred." (*Id.*)(emphasis omitted). Fourth, Cornell and Hendrix argue for dismissal, stating that none of the allegedly false statements is actionable "because none are material individually or in the aggregate." (*Id.*, at 16).

Fifth, Cornell and Hendrix argue that Plaintiff Picard's claims under the Securities Act fail as a matter of law. (*Id.*, at 18). They contend that "Cornell fully disclosed the financial impact of the lease transactions in multiple SEC filings" and that the allegations "do not establish material misstatement or omission" under the Securities Act. (*Id.*). In addition, Cornell and Hendrix argue that Picard lacks standing because he purchased his shares one day before the Secondary Offering, according to his sworn certification. (*Id.*). They argue that, by purchasing his shares a day before

12

the Secondary Offering, he is not a member of the Offering Subclass and has no standing under the Securities Act. Finally, they argue that Picard's § 11 claims are barred because he did not allege the claims until "nearly one year after filing his original complaint." (*Id.*). Cornell and Hendrix argue that "[a]ny effort to relate this claim back must fail because Picard's original complaint, not the consolidated amended complaint, did not allege anything about long-term debt. Instead, Picard alleged that Cornell's third quarter results were false and the Registration Statement incorporated those results." (*Id.*). Defendants argue that because "Section 11 liability rests on false or misleading statements connected to a registration of new securities, allegations related to alleged falsehoods outside the Registration Statement fail as a matter of law." (*Id.*).

Sixth, Cornell and Hendrix contend that the §§ 20(a) and 15 claims are derivative, fail, and must be dismissed. (*Id.*, at 19). They argue that "Section 20(a) and 15 claims are derivative of other securities claims and cannot exist in the absence of a primary violation. Because plainitffs' primary securities claims must be dismissed in their entirety, the Section 20(a) and 15 claims fail as a matter of law." (*Id.*).

Finally, Defendants Cornell and Hendrix argue that the Complaint should be dismissed because Plaintiffs have "failed to cure the fatal defects of their original consolidated complaint." (*Id.*, at 19). Cornell and Hendrix ague that "Plaintiffs have had ample opportunity to plead a sufficient complaint, in fact they have actually amended twice . . . The [PSLRA] disfavors amendment, and its heightened pleading standards reflect the objective of Congress 'to provide a filter at the earliest stage [the pleading stage] to screen out lawsuits that have no factual basis.'" (*Id.*)(quoting *In re Champion Enter., Inc.*, 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001), *aff'd sub. nom. Miller v. Champion Enter., Inc.*, 346 F.3d 660 (6th Cir. 2003))(bracketed language in original).

13

Also on May 5, 2004, Defendant Steven W. Logan filed a separate Motion to Dismiss Plaintiff's First Amended Consolidated Complaint. (Instrument No. 67). Logan argues that the Complaint should be dismissed because the Reform Act substantially heightened pleading standards in securities fraud class actions, and Plaintiffs have not met those standards. (*Id.*, at 8). First, Logan contends that Plaintiffs have not adequately alleged particularized facts showing that Logan, or any Defendant, made false or misleading statements of material fact. (*Id.*, at 9). In support of this contention, Logan claims that Cornell fully disclosed the allegedly omitted facts, that Cornell's change in accounting method does not demonstrate that Cornell violated the GAAP or that Cornell made prior false or misleading statements, and that Plaintiffs have not identified any contemporaneous document or personal source suggesting that Logan made any false or misleading statements. (*Id.*, at 9-15).

Second, Defendant Logan argues that Plaintiffs have failed to plead sufficient facts to show that Logan made any allegedly false or misleading statement with a strong inference of scienter. (*Id.*, at 16). In support of this argument, Logan contends that Plaintiffs' "motive and opportunity" allegations raise no inference of scienter and that Plaintiffs have failed to demonstrate either Logan's actual knowledge or severe recklessness. (*Id.*, at 17-21). Finally, Logan argues that Plaintiffs' claim against him for control-person liability, pursuant to § 20(a) of the Exchange Act and § 15 of the Securities Act, fails because Plaintiffs have failed to establish a "primary" violation of the securities laws and that Logan "directly or indirectly" controlled the violator. (*Id.*, at 24-25).

Plaintiffs filed their Combined Response in Opposition to Motions to Dismiss First Amended Consolidated Complaint on June 14, 2004. (Instrument No. 76). Plaintiffs simultaneously respond to both motions to dismiss, making five arguments against dismissal. First, Plaintiffs contend the

14

false statements were particularly described, appropriately documented, and adequately attributed to each of the Defendants. (*Id.*, at 8). In support of this contention, Plaintiffs state that the Complaint describes the false statements with particularity and explains why the false statements misled investors. (*Id.*, at 9). Plaintiffs also state that Cornell's "well-documented" GAAP violations demonstrate that the Company's financial statements were false when issued. (*Id.*, at 10). Plaintiffs claim that the "true facts" were not disclosed during the Class Period, that Plaintiff's allegations of falsity are adequately documented by contemporaneous sources of information, and that group pleading is not required to sustain the Complaint. (*Id.*, at 19-22).

Second, Plaintiffs argue against dismissal because the allegations in the Complaint, taken as a whole, support a strong inference of scienter. (*Id.*, at 23). In support of this scienter argument, Plaintiffs contend that Logan and Hendrix had involvement in and detailed knowledge of the off-balance sheet transactions, and that their involvement and knowledge provide direct evidence of scienter. (*Id.*, at 24). Plaintiffs also claim that Cornell's restatement provides additional circumstantial evidence of scienter. (*Id.*, at 27). Plaintiffs also support their scienter argument by arguing that Defendants' motive and opportunity to commit fraud lends further support to the inference of scienter, and that the "purported lack of insider trading" does not negate the inference of scienter. (*Id.*, at 29-34).

Third, Plaintiffs argue that the Defendants' false statements were material to investors. (*Id.*, at 34). Plaintiffs claim that, "[a]s a threshold matter, materiality is a question of fact that cannot be resolved on a motion to dismiss." (*Id.*, at 35). In addition, Plaintiffs argue that, in light of all the facts, the false statements were material. (*Id.*). Plaintiffs point to the material impact the restatement

had on the balance sheet, on Cornell's reported debt-to-equity ratio, on Cornell's debt covenants, and on Cornell's stock price. (*Id.*, at 36-39).

Fourth, Plaintiffs contend that Defendants have made no legitimate argument for dismissing Plaintiffs' claims under the Security Act. (*Id.*, at 39). In support of this contention, Plaintiffs claim that Plaintiff Picard does have standing to assert claims on behalf of his class and that the Securities Act claims are not time-barred. (*Id.*, at 40-42). Finally, Plaintiffs argue that Defendants are liable as controlling persons under the Securities and Exchange Acts. (*Id.*, at 44). Plaintiffs state that Defendants' "sole argument for dismissal is that control person liability requires a primary violation to be established and, here, no such violation has been pled. However, as set forth above, the [Complaint] adequately pleads a primary violation under both § 10(b)of the Exchange Act and § 11 of the Securities Act. Because these claims must be upheld, the claims for control person liability should also be sustained." (*Id.*, at 44-45)(internal citations removed).

Defendants filed a Joint Reply in Support of Their Motions to Dismiss Plaintiffs' First Amended Consolidated Complaint on July 9, 2004. (Instrument No. 81). Defendants reply with four main arguments. First, they contend that there is no fraud because Cornell fully disclosed its financial obligations under the two lease transactions. (*Id.*, at 1). Second, Defendants argue that Plaintiffs cannot satisfy the PSLRA's heightened pleading standards because the Complaint fails to show that Cornell's financial statements were false when made. (*Id.*, at 3-4). Defendants contend that Plaintiffs cannot use Cornell's "after-the-fact restatement" to show that the prior financial statements were false when made. (*Id.*, at 6). Defendants also contend that Plaintiffs' fraud theory rests on speculation or misstatements of the "judicially-noticeable facts." (*Id.*, at 8).

16

Third, Defendants argue that the facts, taken together, do not support the necessary strong inference of scienter. (*Id.*, at 11). They assert that Plaintiffs have pled no facts raising an inference of actual knowledge or extreme recklessness, that Cornell's restatement does not raise a strong inference of scienter, and that Plaintiffs' motive and opportunity allegations do not raise any inference of scienter. (*Id.*, at 12-16). Finally, Defendants contend that Plaintiffs have not stated a legitimate argument in opposition to the dismissal of their claims under the Securities Act. (*Id.*, at 19). Defendants argue that Plaintiffs have not alleged with particularity that any statement in the registration statement was false or misleading when made, that Picard did not purchase Cornell stock in the Secondary Offering, and that the one-year statute of limitations bars Plaintiffs' Securities Act claims. (*Id.*, at 19-20).

## II.

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Such dismissals are to be viewed with disfavor and are rarely granted. *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). They will only be granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 S. Ct. 99, 101-102 (1957); *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002). Dismissal should not be granted unless the party would not be entitled to relief under any set of facts or any possible legal theory that could consistently be proven with the allegations in the complaint. *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).

In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiff's complaint. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In addition, the facts are viewed in a light most favorable to the plaintiff. *Id.* "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993)).

A dismissal for failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure is treated as a dismissal for failure to state a claim upon which relief may be granted. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

## III.

The claims asserted in the suit arise under §§ 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a); under Rule 10b-5 promulgated by the SEC, codified at 17 C.F.R. § 240.10b-5; and under §§ 11 and 15 of the Securities Act, codified at 15 U.S.C. §§ 77k and 77o. (Instrument No. 59, at 4). The Court addresses the Exchange Act and Rule 10b-5 claims separately from the Securities Act claims.

## A.

To plead claims under § 10(b) and Rule 10b-5, plaintiffs must allege facts establishing "'(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'" *Nathenson*, 267 F.3d at 406-07 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). "Persons asserting

18

claims under section 10(b) and Rule 10b-5 must also satisfy the enhanced pleading requirments imposed by the [PSLRA] and Federal Rule of Civil Procedure 9(b)." *R2 Investments LDC v. Phillips*, __ F.3d __, No. 04-10030, 2005 WL 469129, at *2 (5th Cir. Mar. 1, 2005). Liability under § 20(a) "may not be imposed absent an underlying violation of the [Exchange] Act." *Id.* Accordingly, the Court will address § 20(a) claims only if the § 10(b) claims survive.

Because this Court concludes that the Plaintiffs have failed to adequately plead the element of scienter, the Court does not address the other requirements of securities fraud class actions and dismisses the §§ 10(b) and 20(a) claims.

### 1.

Congress passed the PSLRA in 1995 in order to "prevent the abuse of federal securities laws by private plaintiffs." *Nathenson*, 267 F.3d at 406. The PSLRA provides that,

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). In response to the PSLRA, the Fifth Circuit has held that "in order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a 'strong inference' of scienter." *Nathenson*, 267 F.3d at 407.

The Fifth Circuit stated, in *R2 Investments LDC v. Phillips*, "We have defined scienter as an 'intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" 2005 WL 469129, at *4 (quoting *Southland Sec. Corp. v. Inspire Ins.*

*Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)(internal citations, quotations, and ellipses omitted)).    Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Nathenson*, 267 F.3d at 407 (citing *Broad v. Rockwell*, 642 F.2d 929, 961 (5th Cir. 1981)).

The plaintiff must allege facts that give rise to "a strong inference of scienter with respect to each individual defendant." *R2 Investments*, 2005 WL 469129, at *4. The Court must review "all the facts and circumstances alleged to determine whether they, *in toto*, raise a requisite strong inference of scienter." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003).

**2.**

In the Complaint, Plaintiffs claim that Defendants made materially fraudulent statements in press releases and financial statements from March 2001, May 2001, August 2001, September 2001, October 2001, November 2001, and December 2001. (Instrument No. 59, at 25-41). Plaintiffs use the same basis for pleading scienter for most of these statements. Plaintiffs plead that scienter was established by the following facts,

    (a)    As highly-trained accountants experienced in these types of transactions, Logan and Hendrix knew the applicable accounting rules governing off-balance sheet transactions, including the requirement that an outside investor, unrelated to Cornell, contribute at least 3% of the equity for the transaction and how that equity interest was calculated.

    (b)    Because Logan and Hendrix were personally involved in the negotiation of the synthetic lease and attempts to structure it so as to permit off-balance

sheet accounting, it can strongly be inferred that Logan and Hendrix knew the material terms and conditions of that transaction and therefore knew or recklessly disregarded that the synthetic lease did not qualify for off-balance sheet treatment as of the time Cornell entered into the synthetic lease and as of the time it utilized the financing provided thereunder . . . .

(c)    Cornell, Logan and Hendrix were each motivated to conceal the true nature of the transaction in order to: (i) mislead investors into believing that Cornell's balance sheet debt and debt-to-equity ratio did not put it at a competitive disadvantage or reduce its opportunities for obtaining new government prison contracts needed for continued growth; (ii) conceal the fact that Cornell was in violation of the debt covenants on its senior loans and had no ability to obtain additional financing necessary to complete the construction of prisons under already-awarded government contracts; (iii) obtain funds to pay off the Senior Notes to avoid the consequences of its breach of the debt covenants contained therein; (iv) permit the Company to raise badly needed capital through the Secondary Offering; and (v) permit Logan and Hendrix to qualify for incentive compensation as the result of their purported success in reducing Cornell's balance sheet debt.

(*Id.*, at 27-28). Plaintiffs also allege that "the importance of the transaction to the Company, given its excessive debt load and its inability to obtain new financing . . . as well as the nature and extent of the restatement, including the fact that the improper off-balance sheet treatment was concealed from investors for seven quarters" lend further support to the inference that the Defendants knew or recklessly disregarded the falsity of the statements made to the public. (*Id.*, at 28). These same allegations are either incorporated by reference or re-inserted with slight modifications as support for the scienter element of each allegedly false statement in the Complaint. (*Id.*, at 30, 31, 34-35, 37, 39, 40, 41).

Plaintiffs also allege one other set of facts in support of the scienter element. They state that the "September 5, 2001 letter from Logan to Lehman Brothers banker David Lavelle, when considered in light of the allegations contained in this Complaint as a whole, strongly supports the inference" of scienter. (*Id.*, at 33).

21

**3.**

Defendant Logan argues that Plaintiffs' "attempt to demonstrate the requisite strong inference of scienter" is too weak to stand. (Instrument No. 67, at 17)(emphasis removed). Logan contends that the three "motive and opportunity" arguments put forth by Plaintiffs in support of scienter are unavailing. (*Id.*). Logan claims that Plaintiffs assert that Defendants had the following three motives "to artificially inflate the value of Cornell's common stock during the alleged class period: (1) to obtain incentive compensation targets; (2) to enable Cornell to successfully complete its secondary public offering on November 27, 2002; and (3) to enable Cornell to remain in compliance with its senior credit facility covenants." (*Id.*). Logan argues that none of these motives gives rise to any inference of scienter. First, Logan claims that the Fifth Circuit has "squarely, and repeatedly, rejected plaintiffs' 'incentive compensation' theory" because such allegations are "universally true of every executive compensated with stock." (*Id.*). Logan also argues that the courts have been "clear that a desire to successfully complete a public offering does not support the required strong inference of scienter." (*Id.*, at 18). Finally, Logan claims that the "Fifth Circuit has held repeatedly . . . that allegations of a company's need to raise additional capital are insufficient to support a strong inference of scienter." (*Id.*). Logan also argues against a finding of scienter based on motive because Logan did not sell any shares of his personal holdings in the Company's stock during the Class Period. (*Id.*, at 20). Logan argues, "This Court and numerous others have held that the absence of insider selling negates an inference of fraudulent intent." (*Id.*).

Logan also contends that Plaintiffs have failed to demonstrate Logan's actual knowledge or severe recklessnes. (*Id.*, at 21). First, Logan argues that Plaintiffs' "assertion that '[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes' is flatly contrary to Fifth Circuit

22

law." (*Id.*, at 22)(citing Instrument No. 59, at ¶ 21). Logan argues that the Complaint "is devoid of any facts available to Logan that would shed light on his state of mind when the Company initially accounted for the two challenged transactions." (*Id.*). Second, Logan contends that Plaintiffs' "allegations that Logan's prior experience as an accountant and personal involvement in negotiating the Synthetic Lease and Sale Leaseback Transactions create a strong inference of scienter" are "vague and too generalized to suggest any inference of scienter." (*Id.*, at 23). Logan also refers to case law in which courts have rejected a finding of scienter based on the accounting and finance training of defendants. (*Id.*).

Third, Logan argues that his involvement in negotiating the agreements at issue also fails to raise a strong inference of scienter. (*Id.*). Logan claims that "general allegations of involvement in the transactions cannot support a strong inference of scienter." (*Id.* at 23-24). Finally, Logan contends that Plaintiffs have failed to "identify any contemporaneous facts suggesting that [Logan] knew the Company's initial accounting treatment violated GAAP–much less was fraudulent." (*Id.*, at 24). He also argues that the "Fifth Circuit has repeatedly recognized that accountants can differ on the proper accounting treatment for a particular transaction. This is particularly true where, as here, the applicable accounting guidelines are unsettled and difficult to apply with consistency." (*Id.*).

Defendants Cornell and Hendrix lodge similar complaints against Plaintiffs' pleading of scienter. Cornell and Hendrix argue that Plaintiffs "rest their scienter allegations on rejected doctrines." (Instrument No. 65, at 12). Cornell and Hendrix argue that, for example, Plaintiffs "repeatedly assert . . . that because of his position within the company, Hendrix knew or should have known of allegedly adverse facts contained in internal reports and documents. This is insufficient

23

to plead scienter in the Fifth Circuit." (*Id.*). Cornell and Hendrix also contend that the fact that Hendrix is alleged to be a "'highly trained accountant'" fails to raise a strong inference of scienter under persuasive authority. (*Id.*)(citing Instrument No. 59, at ¶ 84(a)). These Defendants also argue that it is improper for Plaintiffs to "attempt to raise an inference of scienter as boilerplate pleading" as Plaintiffs allegedly do by incorporating by reference the same scienter allegations for the different allegedly false statements. (*Id.*)(citing Instrument No. 58, at ¶¶ 84(a)-(c), 90, 95, 99(a)-(d), 105, 114, and 116).

Cornell and Hendrix also argue that Plaintiffs have improperly presented Cornell's restatement as an "'admi[ssion]' of prior wrong doing" and have incorrectly used that "admission" to support a finding of scienter. (*Id.*, at 13)(citing Instrument No. 59, at ¶¶ 76, 83(a), 94(a), 104(a), 131, 144, 145). Cornell and Hendrix contend that Plaintiffs "must plead more than mere fraud by hindsight," and must, instead, plead "specific facts demonstrating that Cornell or Hendrix knew or should have known that the information at the time comprised a danger of misleading the market and that, at that time, they either chose to disseminate that information or ignore other people disseminating it." (*Id.*). Because such allegations are not made in the Complaint, these Defendants argue that the Complaint's allegations must be considered "fraud by hindsight" and categorically rejected. (*Id.*).

Finally, Cornell and Hendrix argue that Plaintiffs "assert scienter allegations based purely on the alleged motive and opportunity of Cornell and Hendrix to paint a rosy picture and ensure an inflated stock price to raise capital from a public offering." (*Id.*). Cornell and Hendrix, similar to Logan, argue that these motive and opportunity allegations fail to present a strong inference of scienter. (*Id.*, at 13-14). "Absent allegations that Cornell or Hendrix 'profited from the [allegedly]

24

inflated value,' such charges of motive and opportunity do not support a strong inference of scienter, especially because Hendrix did not sell any of his stock during the putative class period, and Cornell did not gain directly from any stock price increase." (*Id.*, at 14)(bracketed language in original). Finally, Cornell and Hendrix contend that "generic pleading that Hendrix 'did it' for compensation fails to raise a strong inference of scienter." (*Id.*).

**4.**

In response to Defendants' arguments, Plaintiffs contend that the facts and circumstances "'taken together' are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs." (Instrument No. 76, at 23). Plaintiffs assert that, "[t]aken as a whole, plaintiffs have established that defendants acted with at least extreme recklessness in failing to consolidate the financial statements of the two SPEs used to keep debt off of Cornell's books." (*Id.*, at 23-24).

First, Plaintiffs argue that they "are simply advancing the common sense notion that a person's knowledge is the product of [that person's] experience. Where, as here, a person has gained specialized knowledge as a result of [his] experience, that knowledge may help form the basis for inferring scienter." (*Id.*, at 24). Second, Plaintiffs argue that the letter written by Logan to Lehman establishes the scienter inference. (*Id.*, at 25). Plaintiffs contend that the "fact that the letter was hidden from Cornell's outside auditors provides further evidence that it was designed as a pretext to hide the $3.65 million being funneled back to Lehman, as does the illusory nature of the agreement." (*Id.*, at 26). Plaintiffs argue that the letter demonstrates that the Defendants "knew or deliberately disregarded that outside equity had fallen below the 3% required to justify continued off-balance treatment." (*Id.*). Plaintiffs assert that it

25

strains credulity to believe that neither Logan nor Hendrix understood the accounting implications of the transactions which they orchestrated. Nowhere in their briefs do either Logan or Hendrix claim to have been unaware of the details of these transactions, including the relevant accounting rules or the payments Cornell made to the outside investors. At bottom, defendants' position . . . comes down to a contention that they thought their accounting treatment was legitimate. Plaintiffs have alleged sufficient facts regarding defendants' direct knowledge of and participation in the financing transactions to support a strong inference that they knew, or recklessly disregarded, that it was not. This is all that is required to sustain the [Complaint].

(*Id.*, at 27).

Third, Plaintiffs argue that Cornell's restatement provides additional circumstantial support for the inference of scienter. (*Id.*). They contend that the restatement is "not irrelevant to the question of scienter." (*Id.*). Plaintiffs claim that, while a restatement is insufficient to prove scienter on its own, it can provide significant circumstantial evidence of it. (*Id.*). Fourth, Plaintiffs argue that Logan's treatment after the restatement supports the finding of scienter: "the fact that Logan was demoted upon the discovery of the improper accounting for the sale-leaseback, his salary was reduced, and he was forced to give up $1 million in bonus compensation demonstrates his responsibility for the fraud perpetrated on investors, and further supports the inference that he was acting deliberately or recklessly in committing it." (*Id.*, at 28). Plaintiffs also argue that Cornell's amendment of its by-laws "to 'clarify specific levels of authority for members of senior management and identify appropriate limits on such authority'" demonstrates scienter and demonstrates Logan's and Hendrix's "responsibility for the fraud." (*Id.*, at 29).

Fifth, Plaintiffs argue that Defendants' motive and opportunity to commit fraud "lends further strong support to the inference of scienter." (*Id.*). As before, Plaintiffs argue that, while this allegation is not sufficient to plead scienter, without more, it is still a factor to consider. (*Id.*).

Plaintiffs then re-allege, citing directly to the Complaint, the same motive and opportunity arguments they have already made. (*Id.*, at 29-32). Plaintiffs also state that the authorities relied upon by Defendants "fail to blunt the inferences of fraud flowing from Cornell's need to reduce its balance sheet debt in order to avoid the consequences of the impending breach of its debt covenants." (*Id.*, at 31). Plaintiffs argue that a district court case from California[1] supports the assertion that the need to reduce debt can support an inference of motive. (*Id.*, at 32). In addition, Plaintiffs contend that Defendants' reliance on a district court case from Maryland[2] is misplaced because the "allegations in that case were much more generalized than in either this case or [the California case], and appear to have been based entirely on [the defendant's] disclosure that it was in violation of debt covenants when the fraud was revealed." (*Id.*, at 33).

Finally, Plainiffs argue that the strong inference of scienter is "not negated" by the purported lack of insider trading by the Defendants. (*Id.*, at 34). Plaintiffs state that they have not based their allegations on insider trades, "so the fact that *some* defendants did not sell is of no moment." (*Id.*)(emphasis added). The Court notes that Plaintiffs' statement seems to suggest that *other* Defendants *did* sell; there are no facts in the record suggesting that any Defendant sold any stock during the Class Period. Plaintiffs argue that "this Court has recognized [that] the 'lack of stock sales is not necessarily dispositive in pleading a strong inference of scienter.'" (*Id.*)(quoting *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 647 (S.D. Tex. 2001))(emphasis removed). Plaintiffs conclude this argument stating that it is "well established that scienter can be established even in the

---

[1] *In re U.S. Aggregates, Inc. Securities Litigation*, 235 F. Supp. 2d 1063 (N.D. Cal. 2002)(finding that, while a strong inference of motive was established by Plaintiffs pleadings, "motive is not sufficient to raise a strong inference of scienter.")

[2] *In re e.Spire Communications, Inc. Securities Litigation*, 127 F. Supp. 2d 734 (D. Md. 2001).

absence of insider trading" and that "the lack of insider trading by the individual defendants during the Class Period does not defeat plaintiffs' claims." (*Id.*).

### 5.

In reply to Plaintiffs' arguments regarding scienter, Defendants contend that Plaintiffs' "purported inferences of fraud defy logic–they suggest that Logan and Hendrix risked a restatement, a special investigation, and multiple shareholder lawsuits alleging millions of dollars in damages over a $1.35 million purported shortfall in equity investment from a special purpose entity investor. This fails to support an inference of scienter, let alone a strong inference of an intent to defraud." (Instrument No. 81, at 11). Defendants also argue that the Court must consider not only "those facts that plaintiffs highlight" but "all the facts, including those that tend to negate fraudulent intent 'to determine whether the inferences toward scienter are strong or weak.'" (*Id.*)(citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003)).

With regard to Logan and Hendrix's prior experience and knowledge, Defendants argue that Plaintiffs "do not offer a single fact demonstrating that either Logan or Hendrix had any specialized knowledge of the GAAP provisions regarding SPEs." (Instrument No. 81, at 12). Defendants state that, "[i]n the end, plaintiffs' argument ignores the fact that reasonable accountants can differ about the appropriate accounting treatment under GAAP." (*Id.*, at 14). They argue that, even if Logan and Hendrix had all the knowledge Plaintiffs claim they did, "they still acted without scienter as long as they reasonably believed that the accounting treatment complied with GAAP. None of the facts offered by plaintiffs raise any inference that they believed otherwise." (*Id.*).

Defendants also contend that Plaintiffs "overstate the significance of the [Logan/Lehman] letter memorializing Cornell's $3.65 million retainer agreement with Lehman." (*Id.*, at 13). Defendants argue that the Logan/Lehman letter represented a retainer for future, unrelated financial advisory services, and not a kickback for past services, because, while the letter was signed three weeks after the completion of the sale/leaseback transaction, the agreement involved "three specific corporate projects that the Company was considering at the time," and "the letter was signed about seven weeks before Cornell announced its secondary offering, which was led by Lehman Brothers." (*Id.*, at 13-14). Defendants contend, therefore, that any inferences that derive from the letter and its timing should be that the letter was a commemorated a retainer for future services. (*Id.*, at 14).

Defendants then distinguish the case at bar from those cited by Plaintiffs in which GAAP violations supported an inference of scienter. Defendants distinguish these cases because "Cornell fully disclosed its long-term financial obligations under the two transactions at issue," because the accounting principles involved were very complex and were in flux throughout the Class Period, because there was no significant overstatement of revenue, because the restatement had no impact on the Company's revenues or shareholder equity and only a *de mininmis* $11,000 impact on prior earnings. (*Id.*, at 14-16).

**6.**

The Court addresses the different arguments regarding scienter in turn before addressing their cumulative effects.

**a.**

Plaintiffs argue that they have adequately pled the element of scienter, in part, because of the Individual Defendants' past experience and knowledge. "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). The Fifth Circuit has not even granted much weight to this argument when presented in combination with other allegations in support of scienter. *See id.* (finding that plaintiffs scienter argument based on the allegations that the individual defendants were senior level executives who were "intimately familiar with the inner workings of the company," that GAAP violations were made, and allegations of motive and opportunity, together, failed to reach the required standard).

With regard to the Individual Defendants' involvement in negotiating the transactions, "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Barrie*, 397 F.3d at 264 (quoting *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)). In *Barrie v. Intervoice-Brite, Inc.*, the Fifth Circuit found that the defendants had scienter not because of GAAP violations but because the defendants "persisted in the incorrect accounting after receiving" a report on the fraudulent accounting practices at the company. 397 F.3d at 264. In the case at bar, while Plaintiffs allege GAAP violations, neither the existence of GAAP violations nor the Individual Defendants' participation in causing them leads to a strong inference of scienter. The Complaint implies scienter merely "[b]ecause Logan and Hendrix were personally involved," not because they were involved with the intent to violate the GAAP or to recklessly disregard the GAAP. (Instrument No. 59, at 27).

30

Plaintiffs' allegations regarding the Logan/Lehman Letter cannot provide an inference of scienter, either. The letter could easily support Defendants' contention, that it commemorated a retainer agreement for future services. While the Court must accept the Plaintiffs' allegations as true, conclusory allegations will not suffice to prevent a motion to dismiss. *Vulcan Materials*, 238 F.3d at 387. The Plaintiffs' arguments regarding this letter strike the Court as being conclusory allegations. Moreover, Logan's letter simply does not reach the level of an intent to deceive, manipulate, or defraud, or even of severe recklessness, under Fifth Circuit law.

Accordingly, none of Plaintiffs' arguments in support of scienter, based on the Individual Defendants' backgrounds, positions with the Company, involvement in the transactions, or the letter signed by Logan carry much, if any, weight with the Court.

### b.

Plaintiffs also argue that Cornell's financial restatement supports a strong inference of scienter. In fact, Plaintiffs argue that the restatement is "not irrelevant" to the scienter analysis. (Instrument No. 76, at 27). "Not irrelevant" is not very convincing.

Defendants Cornell and Hendrix call this argument "fraud by hindsight." (Instrument No. 65, at 13). The Fifth Circuit has rejected the consideration of a post-statement document which calls the propriety of the statement into question when analyzing the issue of scienter. *See Rosenzweig*, 332 F.3d at 867-68 ("The Wasserstein report is dated December 4, 2000–well after the alleged misrepresentations and omissions–and is plainly a *hindsight* assessment.")(emphasis in original). Indeed, the Court does not see the connection between the restatement and the inference of scienter

supporting each of the alleged material misrepresentations; and the Court, therefore, cannot attribute any weight to the argument.

#### c.

"Allegations of motive and opportunity, standing alone, cannot meet the pleading requirement" of scienter. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir. 2005). However, allegations of motive and opportunity "may meaningfully enhance the strength of an inference of scienter." *Nathenson*, 267 F.3d at 412.

The Complaint's motive and opportunity arguments are based on several allegations. First, to avoid balance sheet debt or a debt-to-equity ratio that would put the Company at a disadvantage. (Instrument No. 59, at 28). Second, to obtain additional financing necessary to complete prison construction. Third, to avoid the consequences of breaching the debt covenants. Fourth, to help Cornell raise capital through the Secondary Offering. And fifth, to allow the Individual Defendants to qualify for incentive compensation. (Id.). None of these motives are convincing to the Court.

"[A]llegations that corporate officers and directors would benefit from enhancing the value of their stock and/or stock options and that the corporation would benefit by receiving more for its shares to be issued in [a future public offering] are . . . insufficient to support a strong inference of scienter." *Nathenson*, 267 F.3d at 420. The Fifth Circuit has even held this motivation to be insufficient when individual defendants did, in fact, proceed to sell shares of their stock during the class period. *Id.* Accordingly, the motivation to improve the value of the stock is even less convincing where, as here, no Defendant even sold his shares. In *Nathenson*, the Fifth Circuit rejected the argument that improving the value of the stock to benefit the individual defendants or

to improve a future public offering would support a finding of scienter. Similarly, in *Abrams v. Baker Hughes Inc.*, the Fifth Circuit stated that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." 292 F.3d at 434.

With regard to the argument that Defendants were motivated to improve the balance sheet, obtain additional financing, avoid breaching the debt covenants, and raise capital, the Court finds these allegations unavailing. The Fifth Circuit has held that these motives are "not the types of motive that support a strong inference of scienter." *Abrams*, 292 F.3d at 434. "The plaintiffs allege that the defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices. This court has held that similar allegations were insufficient to support an inference of scienter." *Id.* Accordingly, none of Plaintiffs' motive and opportunity arguments support the inference of scienter.

### d.

Defendants argue that the Individual Defendants' lack of trading any stocks during the Class Period negates Plaintiffs' arguments regarding scienter. (Instrument No. 67, at 20). In response, Plaintiffs contend that the lack of trading is "of no moment" and "is not necessarily dispositive of scienter." (Instrument No. 76, at 34).

In *Rosenzweig v. Azurix*, the Fifth Circuit noted that where there is "no allegation that defendants sold their [shares of the Company's stock]" the "alleged motive to artificially inflate

33

stock price" is called into question. 332 F.3d at 867. "[T]he allegations of knowledge and severe recklessness must be considered in conjunction with the defendants' bonuses and stock sales profits." *Barrie*, 397 F.3d at 264.

In *Abrams v. Baker Hughes Inc.*, one of the defendants did sell a portion of his shares in the company, and the Fifth Circuit, nevertheless, found that that fact was not probative of scienter. 292 F.3d at 435. The court stated, "Only insider trading in suspicious amounts or at suspicious times is probative of scienter. . . . Further, even unusual sales by one insider do not give rise to a strong inferene of scienter when other defendants do not sell some or all of their shares during the Class Period." *Id.*

While the lack of insider trading may not dispositively negate any finding of scienter, the Court notes that, even where insider trading during the class period has occurred, the Fifth Circuit has found that the strict requirements of pleading scienter have not been met. For the purposes of this motion, the Court finds that the lack of trading adds weight to the argument that a strong inference of scienter cannot be found in the pleadings, but the Court refrains from holding that the lack of trading absolutely negates any inference of scienter.

**e.**

Plaintiffs also argue that Logan's treatment after the financial restatement supports a finding of scienter. (Instrument No. 76, at 28). Plaintiffs state, "the fact that Logan was demoted upon the discovery of the improper accounting for the sale-leaseback, his salary was reduced, and he was forced to give up $1 million in bonus compensation demonstrates his responsibility for the fraud perpetrated on investors, and further supports the inference that he was acting deliberately or

recklessly in committing it." (*Id.*). They also state the Cornell's amending of its by-laws demonstrates scienter. (*Id.*, at 28-29). Plaintiffs admit that these allegations are not "sufficient on their own to establish scienter, but only that they provide some additional circumstantial evidence of scienter which bolster and reinforce the other allegations in the Complaint." (*Id.*, at 29 n.44). Plaintiffs cite no law in support of this argument.

This Court has trouble following the Plaintiffs from here to there. The Fifth Circuit agreed with the District Court in *Rosenzweig v. Azurix Corp.* that "successive resignations of key officials . . . [was] more likely probative only of the fact that the company was falling," not that the resignations were suggestive of scienter. 332 F.3d at 867. Similarly, the employment actions taken against Logan do not seem to be probative of the element of scienter but, rather, of basic employment decisions made by any company. In addition, Plaintiffs concede that these allegations are not enough, alone, to support a strong inference of scienter. They argue that the allegations support the other evidence of scienter. As seen above, however, the Court has not found any allegations that carry weight with regard to scienter.

**f.**

Either individually or considered *in toto*, Plaintiffs' allegations in support of a strong inference of scienter fail to reach the reach the high bar set by the PSLRA in pleading scienter. Accordingly, the Court finds that Plaintiffs have failed to adequately plead a required element of claims under § 10(b) or Rule 10b-5, and those claims are DISMISSED. In addition, because liability under § 20(a) "may not be imposed absent an underlying violation of the [Exchange] Act," *R2 Investments*, 2005 WL 469129, at *2, the Plaintiffs' § 20(a) claim is also DISMISSED.

35

**B.**

Plaintiff Picard brings an additional claim under §§ 11 and 15 of the Securities Act, on behalf of himself and the Offering Subclass. (Instrument No. 59, at 58). This claim is "based on priniciples of strict liability and negligence, not fraud." (*Id.*). Picard contends that "Cornell is strictly liable to the Offering Subclass members for each misstatement or omission contained in the Shelf Registration Statement," which was issued in connection with the Secondary Offering. (*Id.*)(emphasis removed). Picard alleges that the "Individual Defendants, as signatories to the Shelf Registration Statement, were responsible for the preparation of the Shelf Registration Statement. By virtue of the material misrepresentations contained in the Shelf Registration Statement, Plaintiff Picard and the Offering Subclass have been damaged." (*Id.*, at 60). Picard also alleges that the Individual Defendants were both control persons of Cornell, as defined by § 15 of the Securities Act. (*Id.*).

**1.**

In arguing for dismissal, Defendants contend[3] that Plaintiffs allegations do not establish a material misstatement or omission and that, therefore, the statements are not actionable under the Securities Act. (Instrument No. 65, at 18, 18 n.66). They also argue that Plaintiff Picard's Certification of Named Plaintiff ("Certification"), filed on March 20, 2003, "reveals he purchased his shares on the open market on November 26, 2001, one day before the Secondary Offering was effective and Cornell's November 27, 2001 Registration Statement was filed. (*Id.*). Defendants

---

[3]Defendant Logan joins and incorporates by reference Cornell's and Hendrix's arguments regarding the Securities Act. (Instrument No. 67, at 2).

contend that Picard has failed to carry his burden of showing that he purchased a security in the public offering, and that his claim, therefore, must fail. (*Id.*). Finally, Defendants argue that Picard's claim is barred because he filed it outside of the time limitations, and the claim does not relate back. (*Id.*).

Picard responds arguing, first, that the motion to dismiss the Securities Act claim should be denied because the Defendants have failed to carry their burden of showing the Court "why their motion should be granted." (Instrument No. 76, at 40). "With 45 pages of briefs submitted between them, defendants have no excuse for failing to flesh out these arguments, leaving plaintiffs, and the Court, to guess at the basis for their motion." (*Id.*). Second, Picard argues he has standing to assert the claim because he did subscribe to the Secondary Offering. He states that November 26, 2001 was the date Picard subscribed to the offering but was not the date that shares were issued. (*Id.*). Plaintiffs state, "In fact, as the Complaint alleges and a declaration Picard previously submitted to this Court establishes, Picard did purchase his shares in the Secondary Offering, acquiring them directly from Lehman, the lead underwriter." (*Id.*, at 41)(citing Instrument No. 59, at ¶ 15(b)). Third, Picard argues that the Securities Act claim is not time-barred. (*Id.*, at 42). Picard contends that Defendants' arguments on this point are "unintelligible." (*Id.*).

## 2.

Defendants' arguments regarding Picard's standing are unavailing because Plaintiffs clearly pleaded in the Complaint that Picard "purchased the common stock of Cornell in and traceable to the Company's Secondary Offering." (Instrument No. 59, at 5). Because the Court must assume the allegations in the Complaint are true, as pled, Defendants' argument regarding standing fails.

Section 77m provides the limitation on actions brought pursuant to 15 U.S.C. §§ 77k or 77l(a)(2). The limitations state that the action must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Defendants argue that, "by plaintiffs' own allegations, the claims were discovered when the truth was revealed on March 6, 2002." (Instrument No. 65, at 20). March 6, 2002 is the date that the second press release was released. (Instrument No. 59, at 3). Plaintiffs allege that on March 6, 2002, "Cornell's shares plummeted by over 10%, dropping from an opening price of $11.58 per share on March 6, 2002 to close at $10.00 per share on March 7, 2002." (*Id.*, at 44). In *Miller v. Nationwide Life Insurance Company*, the Fifth Circuit held that a supplemental prospectus provided the plaintiff with "constructive notice of Nationwide's alleged violation of the Securities Act." 391 F.3d 698, 700 (5th Cir. 2004). Similarly, this Court finds that the March 6, 2002 press release provided Plaintiffs with constructive notice of the alleged violations of the Securities Act. Accordingly, Picard was required to file his claim by March 6, 2003.[4]

Despite having reached this conclusion, however, the Court cannot proceed further on the statute of limitations analysis. While Defendants argue that "Picard did not allege his 1933 Act claims until nearly one year after filing his original complaint," Defendants offer no actual dates to guide the Court. (Instrument No. 65, at 18). Even in their reply brief, Defendants fail to give the

---

[4]The Court notes Plaintiffs' argument that "the question of when the statute of limitations accrued is an issue of fact that would be inappropriate for resolution on a motion to dismiss." (Instrument No. 76, at 42 n.74). Plaintiffs are, however, incorrect. The Fifth Circuit explicitly affirmed, in *Miller*, the district court's dismissal of a Securities Act action for statute of limitations reasons, where the date of accrual was debated by the plaintiff. 391 F.3d at 700-701.

Court any guidance. (Instrument No. 81, at 20). Accordingly, the Court declines to scour the record in search of the applicable facts.

Defendants also argue that Cornell "fully disclosed the financial impact of the lease transactions in multiple SEC filings. For the same reasons that these allegations do not establish material misstatement or omission under the [Exchange Act], they also fail to do so under the [Securities Act]." (Instrument No. 65, at 18). Those two sentences represent Defendants' entire substantive argument for dismissal of the Securities Act claim. While the defendant's burden under Rule 12(b)(6) is significantly less than it is in a summary judgment motion, the Defendants must still formulate an argument. Without even discussing the requirements for pleading a claim under §§ 11 and 15 of the Securities Act, without even explaining how Plaintiffs have failed to state a claim upon which relief may be granted under those sections of the Act, Defendants request dismissal. Motions to dismiss based on Rule 12(b)(6) are disfavored and will only be granted where the defendant shows beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim. *Shipp*, 199 F.3d at 260; *Conley*, 355 S.Ct. at 101-102. Defendants, here, have not even approached that standard. Accordingly, the motion to dismiss Plaintiffs claim pursuant to §§ 11 and 15 of the Securities Act is DENIED.

## IV.

Based on the foregoing, IT IS HEREBY ORDERED that Defendants Cornell Companies Inc. and John L. Hendrix's Motion to Dismiss **(Instrument No. 65)** and Defendant Steven W. Logan's Motion to Dismiss **(Instrument No. 67)** are each **GRANTED in part** and **DENIED in part.**

Plaintiffs' claims pursuant to §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 are

**DISMISSED**. Plaintiffs claim pursuant to §§ 11 and 15 of the Securities Act is **NOT DISMISSED**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 31 st day of March, 2005, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**