UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

JAN 2 0 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL N. KILBY, CLERK OF COURT

| | | |
|---|---|---|
| In re CORNELL COMPANIES, INC. SECURITIES LITIGATION | § § § | Civil Action No. H-02-0866 |
| | § | CLASS ACTION |
| This Document Relates To: | § § | |
| ALL ACTIONS. | § § | |

**COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

| CASE | TAB |
|---|---|
| *Belman, et al. v. Warrington, et al.,*<br>No. H-91-3767 (S.D. Tex. Nov. 16, 1993) | 1 |
| *Camp v. Progressive Corp.,*<br>No. 01-2680, 2004 U.S. Dist. LEXIS 19172<br>(E.D. La. Sept. 23, 2004) | 2 |
| *Di Giacomo v. Plains All Am. Pipeline,*<br>No. H-99-4137, 2001 U.S. Dist. LEXIS 25532<br>(S.D. Tex. Dec. 19, 2001) | 3 |
| *Draney v. Wilson, Morton, Assaf & McElligott,*<br>[1985-1986 Transfer Binder],<br>Fed. Sec. L. Rep. (CCH) ¶92,359<br>(D. Ariz. Sept. 30, 1985) | 4 |
| *In re Apple Computer Sec. Litig.,*<br>No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) | 5 |
| *In re Dynegy, Inc. ERISA Litig.,*<br>Civil Action H-02-3076 (S.D. Tex. Dec. 10, 2004) | 6 |
| *In re Harrah's Entm't,*<br>No. 95-3925 Section "N," 1998 U.S. Dist. LEXIS 18774<br>(E.D. La. Nov. 25, 1998) | 7 |
| *In re Prudential-Bache Energy Income P'ship Sec. Litig.,*<br>No. MDL 888, 1994 WL 150742<br>(E.D. La. April 13, 1994) | 8 |
| *In re Prudential-Bache Energy Income P'ships Sec. Litig.,*<br>No. 888, 1994 WL 202394<br>(E.D. La. May 18, 1994) | 9 |
| *In re Waste Management, Inc. Sec. Litig.,*<br>Master File No. H-99-2183 (S.D. Tex. May 1, 2002) | 10 |
| *Karasik v. Pac. E. Corp.,*<br>180 A. 604 (Del. Ch. 1935) | 11 |
| *Purdie v. Ace Cash Express, Inc.,*<br>No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547<br>(N.D. Tex. Dec. 11, 2003) | 12 |

| CASE | TAB |
|------|-----|

*Sims v. Shearson Lehman Bros., Inc.*,    13
    [1993-1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶98,134 (N.D.
    Tex. Nov. 29, 1993)

H.R. Conf. Rep. No. 104-369    14
    1995 WL 709276 (1995)

Denise M. Martin, Vinita M. Juneja, Todd S. Foster,    15
Frederick C. Dunbar, *Recent Trends IV: What Explains Filings
and Settlements in Shareholder Class Actions?*
    (NERA Nov. 1996)

DATED:  January 20, 2006    SCHWARTZ, JUNELL, GREENBERG
    & OATHOUT, LLP
ROGER B. GREENBERG
State Bar No. 08390000
Federal I.D. No. 3932

_ROGER B. GREENBERG_

Two Houston Center
909 Fannin, Suite 2700
Houston, TX  77010
Telephone:  713/752-0017
713/752-0327 (fax)

CROWLEY DOUGLAS & NORMAN, LLP
TIMOTHY J. CROWLEY
State Bar No. 05170700
RICHARD E. NORMAN
State Bar No. 00788128
1301 McKinney Street, Suite 3500
Houston, TX  77010-3034
Telephone:  713/651-1771

**Attorneys in Charge and
Liaison Counsel for Plaintiffs**

**Lead Counsel for Plaintiffs:**

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
KEITH F. PARK
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
DENNIS J. HERMAN
SYLVIA WAHBA KELLER
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

S:\Settlement\Cornell.set\COMPENDIUM 00027416.doc

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID A. BELMAN AND TERRY
GOLDBERG, individually and on
behalf of all others similarly
situated,

          Plaintiffs,

       v.

ALFRED C. WARRINGTON, IV,
LARRY MARTIN, CARL E. WARDEN,
MICHAEL D. ADAMS, MICHAEL A.
BAKER, LORNE D. BAIN, AND
SANIFILL, INC.,

          Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. H-91-3767
(Judge Kenneth M. Hoyt)

CLASS ACTION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
*FILED*

NOV 16 1993

Michael N. Milby, Clerk
By Deputy

## ORDER AWARDING ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO NAMED PLAINTIFFS

Upon consideration of the Joint Petition of Plaintiffs' Counsel for Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards to Named Plaintiffs (the "Joint Petition"), the Memorandum and Affidavits of counsel submitted in support thereof and the record herein, it is hereby ORDERED as follows:

1.    The Joint Petition is hereby GRANTED;

2.    The three law firms representing Plaintiffs (hereinafter "Petitioners") are hereby granted an award of fees in the amount of $1,089,000, representing 33% of the Settlement Fund, and reimbursement of expenses in the amount of $275,596.50. Both amounts will be payable on or at any time after the Effective Date (as that term is defined in the Stipulation of Settlement);

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, Clerk
By

4.    Disbursements to Petitioners shall be made in such amounts as determined by plaintiffs' lead counsel [the escrow agent for the Settlement Fund] or, in the absence of agreement, as the Court may subsequently Order;

5.    Petitioners are jointly awarded interest on the fee and expense awards to be paid from the Gross Settlement Fund. Interest on the fee and expense awards shall run from November 8, 1993 and shall continue to earn interest up to the date of payment at the rate of interest which is being earned by the Gross Settlement Fund Escrow Account;

6.    Following the Effective Date of the Settlement, plaintiffs' lead counsel are hereby authorized to withdraw $20,000 from the Settlement Fund, to be divided between the two named plaintiffs;

7.    The Court shall retain jurisdiction to hear any matter arising from this Order.

Done in Houston, Texas, this 5th day of November, 1993.

_____
UNITED STATES DISTRICT JUDGE

57398

2

LEXSEE 2004 U.S. DIST. LEXIS 19172

**KELLY MARIE CAMP VERSUS THE PROGRESSIVE CORP. ET AL; JOHNNY WAYNE KONKLE ET AL. VERSUS THE PROGRESSIVE CORP. ET AL.**

**CIVIL ACTION NO. 01-2680 c/w 03-721, 04-1151, 04-1344, 04-1368 & 04-1921 SECTION "I" (2), CIVIL ACTION NO. 03-2507 SECTION "I" (2)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2004 U.S. Dist. LEXIS 19172*

**September 23, 2004, Decided**
**September 23, 2004, Filed, Entered**

**PRIOR HISTORY:** *Camp v. Progressive Corp., 2003 U.S. Dist. LEXIS 21330 (E.D. La., Nov. 24, 2003)*

**DISPOSITION:** [*1] Objections to Stipulation of Class Action Settlement and Release, as amended overruled. Stipulation of Class Action Settlement and Release, as amended, approved. All claims of all plaintiffs and class members in these actions dismissed. Class Counsel's Motion for Approval of Reasonable Attorneys' Fee and Reimbursement for Costs Expended granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For KELLY MARIE CAMP, plaintiff (0l-CV-2680): Edward J. Castaing, Jr., Edward John Lilly, Jonathan M. Herman, Crull, Castaing, Lilly & Herman, William Gardere Cherbonnier, Ladouceur & Ladouceur, LLC, Peter Brooks Sloss, Murphy, Rogers & Sloss, New Orleans, LA.

For KELLY MARIE CAMP, JULIE CRITTENDEN, ROBERT HAYES BEENE, RICHARD THRELKELD, KAREN O'KEEFE, WILLIAM J WHITTON, SR, DAVID J PATACA, WILLIAM C MOLLOY, CHRISTOPHER HARTZ, DAVID RODRIGUEZ, LORRDINE VARRASSI, LARRY ARGEMAN, KELVIN JONES, CHRIS ACTON, SEAN D COTTON, CHARLES SANFORD, JAMES DOYLE, NICK D METON, DANIELE KYLE, JOHN J HEIN, JENNIFER H MINNER, MICHELLE RAI BONIN, CHRISTINA VALKA RICHARDSON, J DAVID HILLERY, MARY

[*2] CONTI, STEVEN COBB, SILAS COBB, II, JEFERY W BALDOCK, GEORGE WASHINGTON HUNTER, VIVIAN J FRALEY, KARA TIERNEY, PERRY L GILPIN, J GLYNN RYAN, LAURIE CARROLL SWINDELLS, LYNETTE FARRIS, WAYNE FARMER, ANGELIQUE NILES, ROBERT REED, plaintiffs (0l-CV-2680): James Melvin Jacobs, Murphy, Rogers & Sloss, New Orleans, LA.

For KELLY MARIE CAMP, plaintiff (0l-CV-2680): J. Derek Braziel, Edwards & George, LLP, Dallas, TX.

For KELLY MARIE CAMP, plaintiff (0l-CV-2680): Mark Reinhardt, Reinhardt & Anderson, St. Paul, MN.

For KEVIN A KRIEG, JOHN R WALKER, plaintiffs (0l-CV-2680): Brad J. Moore, Stritmatter Kessley Whelan Withey Coluccio, Seattle, WA.

For JULIE CRITTENDEN, ROBERT HAYES BEENE, RICHARD THRELKELD, KAREN O'KEEFE, WILLIAM J WHITTON, SR, DAVID J PATACA, WILLIAM C MOLLOY, CHRISTOPHER HARTZ, DAVID RODRIGUEZ, LORRDINE VARRASSI, LARRY ARGEMAN, KELVIN JONES, CHRIS ACTON, SEAN D COTTON, CHARLES SANFORD, JAMES DOYLE, NICK D METON, DANIELE KYLE, JOHN J HEIN, JENNIFER H MINNER, MICHELLE RAI BONIN, CHRISTINA VALKA RICHARDSON, J DAVID HILLERY, MARY CONTI, STEVEN COBB, SILAS COBB, II, JEFERY W BALDOCK, GEORGE WASHINGTON HUNTER, VIVIAN J FRALEY, KARA TIERNEY, PERRY L GILPIN, J GLYNN [*3]

RYAN, LAURIE CARROLL SWINDELLS, LYNETTE FARRIS, WAYNE FARMER, ANGELIQUE NILES, ROBERT REED, plaintiffs (01-CV-2680): Jonathan M. Herman, Middleberg, Riddle & Gianna, New Orleans, LA.

For LYNETTE FARRIS, WAYNE FARMER, ANGELIQUE NILES, ROBERT REED, plaintiffs (01-CV-2680): W. D. Masterson, Theodore C. Anderson, D. Elizabeth Masterson, Kilgore & Kilgore, PLLC, Dallas, TX.

For JOHNNY WAYNE KONKLE, CHRISTOPHER P VASIL, RONALD GALBO, DEBRA KIGGINS, TRACY SHANE TAYLOR, ROSE ANN BURFORD, ROBERT A MILLS, AMY MURPHY, JOHN BARNETT, ALFONSO A MATAMOROS, JR, DERRICK COOKE, JACQUELYN R MORAN, SUSAN M DRISCOLL, JANE CLARK, MARIE K FELEGI, JOSH BUEHRING, plaintiffs (03-CV-2507): Edward J. Castaing, Jr., Edward John Lilly, Jonathan M. Herman, Crull, Castaing, Lilly & Herman, James Melvin Jacobs, Murphy, Rogers & Sloss, New Orleans, LA.

For JOHNNY WAYNE KONKLE, CHRISTOPHER P VASIL, RONALD GALBO, DEBRA KIGGINS, TRACY SHANE TAYLOR, ROSE ANN BURFORD, ROBERT A MILLS, AMY MURPHY, JOHN BARNETT, ALFONSO A MATAMOROS, JR, DERRICK COOKE, JACQUELYN R MORAN, SUSAN M DRISCOLL, JANE CLARK, JOSH BUEHRING, plaintiffs (03-CV-2507): William Gardere Cherbonnier, Ladouceur & Ladouceur, LLC, New Orleans, [*4] LA.

For ALLAN ABED, intervenor (01-CV-2680): James F. Clapp, Dostart Clapp & Coveney LLP, San Diego, CA.

For PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE CLASSIC INSURANCE COMPANY, PROGRESSIVE HALCYON INSURANCE COMPANY, PROGRESSIVE NORTHERN INSURANCE COMPANY, PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, PROGRESSIVE SECURITY INSURANCE COMPANY, PROGRESSIVE SPECIALTY INSURANCE COMPANY, defendants (01-CV-2680, 03-CV-2507): Ellis B. Murov, Beverly Ann Aloisio, Meredith Moore Hayes, Deutsch, Kerrigan & Stiles, Charles F. Seemann, III, Shook, Hardy & Bacon, LLP, New Orleans, LA.

For PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE CLASSIC INSURANCE COMPANY, PROGRESSIVE HALCYON INSURANCE COMPANY, PROGRESSIVE NORTHERN INSURANCE COMPANY, PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, PROGRESSIVE SECURITY INSURANCE COMPANY, PROGRESSIVE SPECIALTY INSURANCE COMPANY, defendants (01-CV-2680, 03-CV-2507): Gregory V. Mersol, Baker & Hostetler, Cleveland, OH.

For PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE CLASSIC INSURANCE COMPANY, PROGRESSIVE HALCYON INSURANCE COMPANY, PROGRESSIVE NORTHERN [*5] INSURANCE COMPANY, PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, PROGRESSIVE SECURITY INSURANCE COMPANY, PROGRESSIVE SPECIALTY INSURANCE COMPANY, defendants (01-CV-2680, 03-CV-2507): Mark J. Foley, George A. Voegele, Jr., Klett Rooney Lieber & Schorling, Philadelphia, PA.

For PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE CLASSIC INSURANCE COMPANY, PROGRESSIVE HALCYON INSURANCE COMPANY, PROGRESSIVE NORTHERN INSURANCE COMPANY, PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, PROGRESSIVE SECURITY INSURANCE COMPANY, PROGRESSIVE SPECIALTY INSURANCE COMPANY, defendants (01-CV-2680, 03-CV-2507): David L. Warren, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, PC, Birmingham, AL.

**JUDGES:** JOSEPH C. WILKINSON, JR., UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** JOSEPH C. WILKINSON, JR.

**OPINION:**

### CONDITIONAL DISMISSAL ORDER AND REASONS

On September 22, 2004, the court conducted a joint fairness hearing concerning a proposed settlement of all claims in Kelly Marie Camp v. The Progressive Corp. et al., n1 Civil Action No. 01-2680, and the five cases consolidated with it. The court had previously conditionally certified Camp as a collective action to recover unpaid overtime [*6] wages from Progressive under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Record Doc. No. 71.

n1   Defendants are The Progressive Corporation, Progressive Casualty Insurance Company, Progressive Classic Insurance Company, Progressive Halcyon Insurance Company, Progressive Northern Insurance Company, Progressive Northwestern Insurance Company, Progressive Security Insurance Company and Progressive Specialty Insurance Company (collectively "Progressive").

A fairness hearing concerning the proposed settlement was also conducted at the same time in the case of Johnny Wayne Konkle et al. v. The Progressive Corp. et al., n2 Civil Action No. 03-2507. Plaintiffs also filed the Konkle action as a putative collective action to recover unpaid overtime wages under the FLSA. However, the case has not yet proceeded to the certification stage.

n2 Defendants in this action are the same as those in the Camp action.

[*7]

Participating in the joint fairness hearing were Edward Lilly, Edward J. Castaing, Jr., Jonathan M. Herman, William Cherbonnier and James M. Jacobs, representing plaintiffs in all of the captioned cases; and Ellis B. Murov and Gregory V. Mersol, representing defendants in all cases.

The proposed settlement includes a lump sum payable by Progressive to plaintiffs' attorneys for their fees and costs. Class Counsel filed a Motion for Approval of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended, which addresses the reasonableness of the proposed attorney's fees and costs. Record Doc. No. 1796. The issues raised by Progressive's partial opposition to that motion, Record Doc. No. 1797, were resolved by the court's minute entry dated July 1, 2004. Record Doc. No. 1808. Accordingly, the motion is unopposed.

Having considered the complaints, as amended; the record; the evidence; the Stipulation of Class Action Settlement and Release (the "Stipulation"), as amended orally in open court and as will be amended in writing consistent with the oral amendments; the written objections of class members to the settlement; and the applicable law, and for the following reasons, the court [*8] enters the order set forth below.

I. PROCEDURAL BACKGROUND

A. The *Camp* Litigation

Camp was formerly an insurance claims representative employed by one of the Progressive defendants. She filed the instant action, individually and on behalf of those similarly situated, in this court to recover unpaid overtime wages from Progressive under the FLSA. Camp also sought a declaratory judgment that Progressive had violated the FLSA by improperly classifying her and other claims representatives nationwide as administrative employees who are exempt from the overtime provisions of the FLSA. First Amended Complaint, Record Doc. No. 31. This matter was referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 45.

On November 8, 2002, the court conditionally certified a nationwide class in Camp under *Section 216(b) of the FLSA,*

consisting of all current and former salaried employees of the Progressive family of insurance companies ("Progressive Insurance Company"), located in the 50 States, who are or were employed as claims [*9] representatives or otherwise performed claims adjusting services consistent with the policies, procedures, scripts and manuals promulgated by Progressive Insurance Company and who did not receive overtime pay within the two years preceding the date of entry of the instant order or within the three years preceding the date of entry of the instant order if the violation was willful.

Record Doc. No. 71.

B. The *Farris* Litigation

Lynette Farris and other plaintiffs brought an FLSA action against Progressive in state court in Texas. That case was removed to federal court in the Northern District of Texas, which transferred it to this court under the first-to-file rule. It was filed as C.A. No. 03-721, consolidated with Camp, Record Doc. No. 5, and referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 6.

C. The *Walker* Litigation

John Walker and Kevin A. Krieg filed an action in federal court in the Western District of Washington,

alleging misclassification of Progressive's claims representatives nationwide as exempt [*10] administrative employees, in violation of the overtime provisions of the FLSA and similar Washington state laws. The court dismissed the case in favor of the Camp litigation under the first-to-file rule.

Plaintiffs re-filed their class action complaint in Washington state court, alleging only violations of state law. Defendants removed it to federal court, where it was again dismissed in favor of the Camp litigation under the first-to-file rule. That dismissal is currently on appeal in the United States Court of Appeals for the Ninth Circuit.

After the dismissal, Walker and Krieg opted into the Camp litigation. Camp, Walker, and Krieg filed a Third Amended Complaint in Camp, as part of the settlement proposal, seeking to establish a settlement class under Washington law, while leaving the appeal to the Ninth Circuit undisturbed pending the settlement proceedings. Record Doc. No. 1788.

D. The *Dailey* Litigation

David G. Dailey filed a class action complaint in state court in Pennsylvania, alleging that Progressive had misclassified its claims representatives in Pennsylvania as exempt in violation of state law. Progressive removed the action to federal court, [*11] but it was remanded to state court.

In connection with the proposed settlement, Dailey amended his complaint to assert an FLSA claim. Progressive then removed the suit to federal court in Pennsylvania, which transferred it to this court. It was filed under C.A. No. 04-1344 and consolidated with Camp. Record Doc. No. 2. This matter was subsequently referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 3.

E. The *Konkle* Litigation

Johnny Wayne Konkle and other plaintiffs filed this action in this court, alleging that Progressive had misclassified its claims representatives nationwide as exempt during their introductory training periods only, in violation of the FLSA. This matter was referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 18. This action has not been consolidated with Camp.

F. The *Jonas* Litigation

Camille Ephraim Jonas and Christine Maloney filed a class [*12] action complaint in state court in New York, alleging that Progressive violated New York law by classifying its claims representatives in the state as exempt. Progressive removed the action to federal court in the Eastern District of New York. The case was transferred to this court, filed under C.A. No. 04-1368, and consolidated with Camp. Record Doc. No. 3. This matter was subsequently referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 4.

G. The *Rorie* Litigation

David Rorie filed a class action in Maryland state court, alleging that Progressive violated state law by classifying its claims representatives in Maryland as exempt. Progressive removed the action to federal court for the District of Maryland, which transferred it to this court, where it was filed under C.A. No. 04-1151 and consolidated with Camp. Record Doc. No. 4. This matter was subsequently referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent [*13] of all parties. Record Doc. No. 5.

H. The *Ireland* Litigation

Stewart Ireland, III filed a class action complaint in federal court for the Eastern District of Michigan, alleging that Progressive violated Michigan law by misclassifying its claims representatives in that state as exempt. The action was transferred to this court, where it was filed under C.A. No. 04-1921 and consolidated with Camp. Record Doc. No. 7. This matter was subsequently referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with *28 U.S.C. § 636(c)* upon written consent of all parties. Record Doc. No. 8.

I. Discovery and Motions

The parties in Camp and Konkle have exchanged extensive written discovery requests and responses and have conducted 35 depositions. Both sides have submitted partially dispositive motions in Camp, some of which have been resolved in favor of Progressive.

J. The Proposed Settlement

On June 18, 2004, I granted the parties' Joint Motion for Preliminary Approval of Settlement of Captioned Collective and Class Actions in all of the captioned cases. As part of the preliminary approval order, [*14] I ordered the Claims Administrator (as defined in the Stipulation, as amended) to mail a Notice of Class Action Settlement, Standard Claim Form, and Request for Exclusion to each class member. Class members were ordered to file any written objections to the settlement agreement with the court no later than five days before the fairness hearing, which was set for August 18, 2004.

Record Doc. No. 1794 in C.A. No. 01-2680; Record Doc. No. 54 in C.A. No. 03-2507.

The parties continued to negotiate a final stipulation of settlement. The court extended the deadline for filing the final stipulation and continued the fairness hearing until September 15, 2004. Record Doc. No. 1809 in C.A. No. 01-2680; Record Doc. No. 53 in C.A. No. 03-2507. The parties filed their Final Stipulation on July 19, 2004. Record Doc. No. 1810 in C.A. No. 01-2680; Record Doc. No. 54 in C.A. No. 03-2507. Because this court was closed on September 15, 2004 due to the approach of Hurricane Ivan, the fairness hearing was continued for one week to September 22, 2004. Record Doc. No. 1822 in C.A. No. 01-2680; Record Doc. No. 57 in C.A. No. 03-2507. The Stipulation was amended orally in open court by counsel for both parties [*15] during the hearing and will be amended in writing consistent with the oral amendments.

## II. THE SETTLEMENT AGREEMENT IS APPROVED

### A. Legal Standards for Approval of Settlement

Before the court may approve a settlement in a collective action brought under the FLSA, it must first determine whether the settlement involves the resolution of a bona fide dispute over an FLSA provision and then decide whether the settlement is fair and reasonable. *Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1352-55 (11th Cir. 1982); Jarrard v. Southeastern Shipbldg. Corp., 163 F.2d 960 (5th Cir. 1947); Stalnaker v. Novar Corp., 293 F. Supp. 2d 1260, 1263 (M.D. Ala. 2003)* (quoting *Lynn's Food Stores, Inc., 679 F.2d at 1354).*

The instant actions brought under the FLSA presented bona fide disputes over FLSA provisions, including whether the administrative exemption from overtime pay is applicable to the named plaintiffs and class members during both their training and post-training periods, whether class members engaged in production activities, whether the applicable statutes of limitations might bar any class members' [*16] claims, whether class members were similarly situated for purposes of certification of a collective action, whether Progressive willfully violated the statute or acted in good faith, the extent of overtime actually worked, the amount of overtime pay that may be due, and the possibility of recovery of liquidated damages.

Like the FLSA, *Fed. R. Civ. P. 23(e)*, which governs settlement of class actions, requires court approval before a proposed class action settlement may be finalized. Such a settlement must be "fair, adequate and reasonable" and cannot be the product of collusion between the parties. *In re Beef Indus. Antitrust Litig., 607 F.2d 167, 179 (5th Cir. 1976); Ruiz v. McKaskle, 724*

*F.2d 1149, 1152 (5th Cir. 1984); Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977).* Thus, the *Rule 23(e)* standard encompasses the "fair and reasonable" settlement standard of the FLSA collective action, and cases interpreting *Rule 23(e)* are analogous and applicable to the instant FLSA actions.

The transferred and consolidated cases brought under state law are opt-out class actions under the applicable [*17] state laws and are equivalent to Rule 23 class actions. Wash. R. Super. Ct. Civ. Ct. R. 23; *Pa. R. Civ. P. 1711; N.Y. C.P.L.R. § 903; Md. R. Civ. P. 2-231; Mich. Ct. R. 3.501.* Each state's laws require court approval of class settlements and provide the same "fair, adequate and reasonable" standard as *Fed. R. Civ. P. 23(e). Pickett v. Holland Am. Line-Westours, Inc., 145 Wn.2d 178, 35 P.3d 351, 356 (Wash. 2001); Fischer v. Madway, 336 Pa. Super. 289, 485 A.2d 809, 812 (Pa. Super. Ct. 1984); State v. Philip Morris, Inc., 179 Misc. 2d 435, 686 N.Y.S.2d 564, 565 (N.Y. Sup. Ct. 1998); Dotson v. Bell Atlantic-Md., Inc., No. CAL 99-21004, 2003 WL 23508428, at *4 (Md. Cir. Ct. Nov. 13, 2003); Brener v. Marathon Oil Co., 222 Mich. App. 128, 565 N.W.2d 1, 3 (Mich. Ct. App. 1997).*

In determining whether a settlement is fair, adequate and reasonable, the court should consider the following six factors:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the [*18] stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983)* (citing *Parker v. Anderson, 667 F.2d 1204, 1209 (5th Cir. 1982)).*

When considering these factors, the court should keep in mind the "strong presumption" in favor of finding a settlement fair. *Cotton, 559 F.2d at 1331; Henderson v. Eaton, 2002 U.S. Dist. LEXIS 20840, No. 01-0138, 2002 WL 31415728, at *2 (E.D. La. Oct. 25, 2002)* (Vance, J.). Moreover, the court is aware, as the parties must also be, that a "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re General Motors Corp. Pick-Up*

*Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 806 (3d Cir. 1995)* (citing *Cotton, 559 F.2d at 1330*).

### B. Certification of Collective Action

Certification of a class for settlement purposes is useful in resolving major class action disputes. See, e. [*19] g., *In re Corrugated Container Antitrust Litig., 643 F.2d 195, 207-10 (5th Cir. 1981); In re Beef Indus. Antitrust Litig., 607 F.2d at 173-77*. Accordingly, IT IS ORDERED that two collective action classes are certified for settlement purposes only, as follows.

#### 1. *The Training Class*

The Training Class for settlement purposes is that alleged in the Konkle litigation, i.e., any and all persons who went through one or more introductory training classes (Property Damage I, Casualty I, and/or Medical Representative I) in the entire United States between April 29, 1996 and December 31, 2001 ("Training Period"), and who did so while occupying the positions of (1) Associate Claims Representative, (2) Claims Representative I, (3) Medical Representative I, and/or (4) SIU Special Investigator I. Persons who are members of the Post-Training Class may also be part of the Training Class, provided that they occupied one of these positions during the Training Period.

Konkle is appointed the Class Representative for this class.

#### 2. *The Post-Training Class*

The Post-Training Class consists of the class already conditionally certified in Camp. For [*20] settlement purposes only, the Post-Training Class consists of those who occupied the positions of (1) Associate Claims Representative, (2) Claims Representative I, (3) Claims Representative II, (4) Claims Specialist, (5) Medical Representative I, (6) Medical Representative II, (7) Medical Representative III, (8) PFP Claims Representative III, (10) SIU Special Investigator I, (11) SIU Special Investigator II, (12) Senior Claims Representative Certified, and/or (13) Senior Claims Specialist. The class will also consist of those members of the classes in Walker, Dailey, Jonas, Rorie and Ireland who occupied the same 13 positions in the original forum states of those actions during the Class Period, as defined for each class in the Stipulation, as amended.

In addition, for purposes of settlement, Johnny Wayne Konkle, Christopher P. Vasil, Ronald Galbo, Debra Kiggins, Tracy Shane Taylor, Rose Ann Burford, Robert A. Mills, Amy Murphy, John Barnett, Alfonso A. Matamoros, Jr., Derrick Cooke, Jacquelyn R. Moran, Marie K. Felegi and Josh Buehring (the named Konkle plaintiffs) shall be considered part of the Post-Training Class for their post-training claims.

Finally, as a result [*21] of the filing of the Third Amended Complaint in Camp, those persons covered by the uncertified Walker class shall be included in the Camp class.

Camp is appointed as Class Representative for this class. The Plaintiffs' Steering Committee is re-appointed. Record Doc. Nos. 11, 639.

### C. The Elements of the Settlement Agreement

The entire settlement consideration is $ 5,400,000. From this amount, plaintiffs' counsel seek attorney's fees of $ 1,600,000, which is less than 30% of the total, to be deducted off the top of the $ 5,400,000 total consideration, plus reimbursement of their actual costs out of the funds remaining after deducting the attorney's fees.

There appear to be several typographical errors in the numbers and calculations set forth on page 18 of the Final Stipulation that was filed in the record. Paragraph VII states that Class Counsel will submit an application for up to $ 189,539.11 in actual costs. However, Paragraph VIII(A) states that $ 180,539.11 will be dedicated to costs out of the $ 3,800,000 total settlement fund, leaving a balance of $ 3,619,406.90 to be divided among the class members.

To complicate the matter further, plaintiffs' counsel seek [*22] actual costs in a third amount of $ 186,204.78 in their motion for attorney's fees and costs, as reflected in Exhibit A to their motion. Record Doc. No. 1796. When these discrepancies were brought to the attention of counsel during the hearing, the parties agreed to amend the Stipulation to state that plaintiffs' counsel are entitled to recover their actual costs of $ 186,204.78 and that Progressive will pay to plaintiffs' counsel that amount, rather than the amounts of either $ 180,539.11 or $ 189,539.11 in the original Stipulation. The change in the amount of costs will have no affect on the amounts allocated to the class members.

Of the $ 3,619,460.90 amount allocated to the class members, $ 1,831,090 will be allocated to the Training Class, $ 1,686,370.90 will be allocated to the Post-Training Class and $ 102,000 will be allocated to the Class Representatives as an incentive payment and enhanced award for their participation in this litigation.

The Training Fund of $ 1,831,090 will be distributed to approximately 6,714 class members. Each plaintiff will be entitled to a distribution based on the assumption that, on average, each one worked four hours of overtime per week for [*23] six weeks during training, at an average annual salary of $ 26,000. The amount derived by this initial calculation will be doubled to reflect the penalty wages to which each class member would be entitled under the FLSA, should they prevail at trial.

Post-Training Class members shall be paid from the $ 1,686,370.90 Post-Training Fund an amount based on their actual weeks worked, within the applicable statute of limitations. This amount will be distributed to approximately 3,349 class members. Each plaintiff will be entitled to a distribution based on the assumption that, on average, each worked four hours of overtime per week for 80 weeks, at an average annual salary of $ 32,999. Because these claims are comparatively weak, the result of this calculation will be adjusted downward by 80% to reflect only a 20% chance of success on the merits of the post-training claims.

The Class Representatives and some other plaintiffs will receive incentive payments for their participation in this litigation, as follows: (1) $ 10,000 to Camp; (2) $ 2,500 to any plaintiff, other than Camp, who gave a deposition; (3) $ 1,000 to any plaintiff, other than Camp, who assisted in the preparation of written [*24] discovery responses but did not give a deposition; and (4) $ 1,000 to Konkle, in addition to any payment he may receive as a result of his participation in discovery. The parties estimate these payments will total $ 102,000 and will be paid before the establishment of the Training and Post-Training Funds.

. D. Analysis of the *Reed* Factors

Having considered all of the Reed factors, *703 F.2d at 172*, in light of the circumstances of this case, as discussed below, I find that the proposed settlement is fair, reasonable and adequate to the class members.

1. *No Evidence of Fraud or Collusion*

The court may presume that a proposed settlement is fair and reasonable when it is the result of arm's length negotiations. 4 Newberg on Class Actions § 11.41 (4th ed.) (available on Westlaw).

The initial presumption of fairness of a class settlement may be established by showing:

1. That the settlement has been arrived at by arm's-length bargaining;
2. That sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently;
3. That the proponents of the settlement are counsel experienced in similar litigation; [*25] and

4. That the number of objectors or interests they represent is not large when compared to the class as a whole.
This initial presumption must then withstand the test of the plaintiffs' likelihood of success.

Id.

There is also a presumption that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary. Id. § 11.51.

In the instant case, no evidence refutes these presumptions. On the contrary, the evidence establishes that grueling settlement discussions were conducted during almost three years of litigation in this court, culminating in an extensive four-day mediation session with a former United States District Judge acting as mediator and, at the request of all counsel, several additional settlement conferences conducted by me that led to finalization of the Stipulation that was filed in the record. Thirty-five depositions were taken, voluminous discovery requests were propounded, and thousands of pages of documents were produced. Counsel for both sides are experienced in complex and class litigation, and they were thoroughly familiar with the facts and legal issues when they reached the settlement agreement. As of [*26] this date, I have received only 10 written objections to the settlement from among the thousands of class members.

The Stipulation, as amended, treats all class members uniformly. Benefits will be distributed based on objective criteria of employment status and amount of overtime worked.

The additional amounts awarded to Class Representatives Camp and Konkle and to those plaintiffs who participated directly in discovery are reasonable. These incentive payments compensate them for their additional time and efforts spent in assisting counsel to prosecute these actions, which benefitted the classes as a whole. "Federal courts consistently approve incentive awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they shoulder during litigation."*Henderson, 2002 U.S. Dist. LEXIS 20840, 2002 WL 31415728, at *6* (citing *In re Southern Ohio Corr. Facility, 175 F.R.D. 270, 272-73 (S.D. Ohio 1997)* (collecting cases)).

Accordingly, I find that the Stipulation, as amended, is the result of arm's length negotiations and that there is no evidence of fraud or collusion. I therefore presume that the proposed settlement is fair and reasonable. [*27]

2. *The Complexity, Expense and Likely Duration of the Litigation*

3. *The Stage of the Proceedings and the Amount of Discovery*

These two related factors weigh in favor of finding that the settlement is fair and reasonable. The Camp litigation was the first action filed, on August 31, 2001.

A collective action in Camp was conditionally certified on November 8, 2002 and the court ordered that notice be given to potential class members that they must opt in to the action in writing no later than 120 days later if they wanted to participate. Record Doc. No. 71.

The discovery process was painstaking, complex and contentious. The parties in Camp exchanged extensive written discovery, produced massive amounts of documents, conducted 35 depositions around the country and had numerous hearings before the court about discovery issues. The Camp Case Management Order was amended four times to attempt to contain the litigation, especially discovery, within reasonable limits. The court authorized the parties to use in Konkle the discovery materials that had been produced in Camp.

Both sides filed partially dispositive motions to narrow the issues in Camp and [*28] Konkle, some of which were granted and some of which were dismissed as moot pending the parties' settlement negotiations. Counsel vigorously engaged their opponents on the legal issues and the facts. Every motion filed in this action engendered opposition memoranda and, usually, reply memoranda and sometimes surreply memoranda, with memoranda often exceeding the court's usual limit of 25 pages. The court held numerous motion hearings and status conferences during the almost three years that this litigation has been pending in this court.

A jury trial in Camp was scheduled to begin on October 25, 2004 and was projected to last three weeks. Before that would occur, Progressive intended to file a motion to decertify the collective action, which would have required extensive briefing by both parties, with numerous exhibits presented to address the multiple legal and factual questions raised by a motion to decertify, and a lengthy hearing and ultimate opinion by the court. Progressive certainly would have filed additional summary judgment motions following a decision on decertification.

The Class Representatives, Class Counsel and Progressive participated in a four-day mediation [*29] in February and March 2004 with the Hon. Richard McQuade, Jr. as mediator. They succeeded in resolving many issues towards a settlement, and I was later able to assist them with resolving the few remaining issues.

Thus, this litigation has been complex, expensive, and time-consuming for counsel, the Class Representatives, Progressive and the court, and was scheduled to continue at least into the beginning of November 2004 for Camp and into 2005 for Konkle. These factors weigh in favor of the settlement.

4. *The Probability of Plaintiffs' Success on the Merits*

This factor militates heavily in favor of approving the settlement. The court should not engage in a trial on the merits when examining the fairness of a proposed settlement because the very purpose of the compromise is to avoid the delay and expense of a trial. *Reed, 703 F.3d at 172*. However, the court must analyze the law and facts to some extent to examine the probability of plaintiffs' success on the merits.

a. The exemption for administrative employees

*Section 207(a)(1) of the FLSA* requires an employer to pay its employees overtime compensation for working more than 40 hours per week. [*30] *29 U.S.C. § 207(a)(1)*. However, there are certain exemptions to this rule, including one for "any employee employed in a bona fide executive, administrative, or professional capacity." Id. *§ 213(a)(1)* (emphasis added).

An employee who receives a salary of more than $250 per week and whose "primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer ... where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment" is properly classified as an administrative employee. 29 C.F.R. § 541.214(a) (as in effect before August 23, 2004). n3

> n3 The regulations governing exemptions from overtime for executive, administrative, professional, outside sales, and computer employees were significantly revised effective August 23, 2004. See *69 Fed. Reg. 22,122-01,* 2004 WL 865626 (April 24, 2004) (codified at 29 C.F.R. Part 541).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*31]

Thus, an employee must meet three requirements to be deemed exempt from the FLSA overtime pay provision: "(1) the salary requirement; (2) the requirement that the employee's primary duty consists of work directly related to management policies or general business operations; and (3) the requirement that the employee's primary duty includes the exercise of discretion and independent judgment." *Robinson-Smith v. Government Employees Ins. Co., 323 F. Supp. 2d 12, 18 (D.D.C. 2004)*.

Progressive argues that its claims representatives fall within this exemption. It is undisputed that plaintiffs meet the salary requirement. At issue are whether plaintiffs' work was directly related to management policies or general business operations and whether it

included the exercise of discretion and independent judgment.

However, before addressing those criteria, the court examines the likelihood that these cases could even proceed as collective actions to recover overtime under the FLSA.

b. Continued certification is highly unlikely

The court conditionally certified Camp as a collective action pursuant to the FLSA and the two-step, conditional certification process approved [*32] by the Fifth Circuit in *Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995)*, based on a finding at the time of certification that the putative class members were "similarly situated." Under the two-step, conditional certification process, defendant will usually file a motion to decertify after discovery has been completed. *Id. at 1214.*

Progressive will file such a motion if Camp does not settle. It is extremely likely that I would grant that motion. At the conditional certification stage, the "similarly situated" standard for putative class members "is lenient, plaintiff's burden is not heavy, the evidence needed is minimal and the existence of some variations between potential claimants is not determinative of lack of similarity." Record Doc. No. 71, at p.8. I found then that "Camp has presented the bare minimum of evidence necessary to show that she is similarly situated to other potential claimants." Id. at p. 10 (emphasis added).

At the decertification stage, by contrast,

> the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. [*33] If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives-i.e. the original plaintiffs-proceed to trial on their individual claims.

*Mooney, 54 F.3d at 1214.*

The evidence presented in Camp to date convinces me that my original misgivings about the thinness of plaintiff's evidence that she and the class are similarly situated will be confirmed if a motion to decertify is filed. Unless some evidence about which I am currently unaware would be submitted, I would likely grant that motion. See *Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 499 (D.N.J. 2000)* (denying class certification after extensive discovery; plaintiffs and class members not similarly situated when job responsibilities differed); *Ray v. Motel 6 Operating, Ltd. Pshp., 1996 U.S. Dist. LEXIS 22565, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996)* (denying class certification upon review of extensive facts; plaintiffs and class members [*34] not similarly situated because of different salaries, geographic locations, and supervisors); *Brooks v. Bellsouth Telecomms, Inc., 164 F.R.D. 561, 569 (N.D. Ala. 1995)*, aff'd, *114 F.3d 1202 (11th Cir. 1997)* (denying class certification after extensive discovery; plaintiffs and class members not similarly situated when they represented a variety of pay grades); *Tucker v. Labor Leasing, Inc., 872 F. Supp. 941, 946 (M.D. Fla. 1994)* (same); *Ulvin v. Northwestern Nat'l Life Ins. Co., 141 F.R.D. 130, 131 (D. Minn. 1991)* (same).

In the absence of any certified collective action, only the individually named plaintiff, Camp herself, could proceed to trial in Camp. No collective or class action has been certified in any of the other cases consolidated with Camp.

I have already denied plaintiffs's motion to certify a class conditionally in Konkle because "my own experience in the Camp case has convinced me that the two-stage conditional certification process is hugely wasteful, inefficient and ineffective." Record Doc. No. 38, at p.4. Instead, the parties in Konkle were set to proceed under a *Fed. R. Civ. P. 23* [*35] model, with discovery initially limited to class certification issues and a firm date set for plaintiffs to file a motion to certify a collective action after that discovery had been completed. Id. If the motion to certify were denied, only the 14 individually named plaintiffs would be able to proceed with that action.

All other putative class members in these cases would have to proceed with individual actions, if they chose to do so and if they could find counsel willing to accept their cases. They would face the weakness of many of their individual claims and the expense, delays and risks of litigation. Even under the ridiculous assumption of a 100% chance of success on the merits, the total damages that could be awarded to the individual plaintiffs in any of these actions in the absence of certification would be considerably less than the multi-million dollar settlement being offered here. Thus, the probable outcomes of Progressive's decertification motion in Camp and plaintiffs' certification motion in Konkle alone indicate that the settlement proposal is fair and reasonable.

Nonetheless, the court must assess the reasonable probabilities of plaintiffs' success on [*36] the merits, assuming that plaintiffs could proceed to trial with their collective actions. These probabilities differ for the Training and the Post-Training Classes.

c. The Post-Training Class likely meets both tests for the exemption

The court must determine whether the primary duties of the Post-Training Class were directly related to management policies or general business operations and whether those duties included the exercise of discretion and independent judgment.

Progressive alleges that it is in the business of selling insurance. It contends that its claims adjusting function is merely a general business operation of its primary business because most policyholders never make a claim. Plaintiffs contend that Progressive is an adjusting company and that plaintiffs are "production" workers rather than administrative employees. Progressive also argues that all post-training adjusters exercised sufficient discretion and independent judgment to qualify them as bona fide administrative employees, even if they did not always make the final decisions about the claims they handled.

It appears that the Post-Training Class members meet both of these definitions to qualify [*37] for the administrative exemption. The claims of the Post-Training Class are both weak and limited in time. The FLSA provides a two-year statute of limitations, except that a three-year statute of limitations applies to willful violations. The court has already granted Progressive's First Motion for Partial Summary Judgment and ruled that the two-year statute of limitations applies to the Post-Training Class. Record Doc. No. 1729. This limits the number of claimants and the amount of damages that each may recover.

The parties' Stipulation, as amended, acknowledges the weakness of the Post-Training Class's claims when it provides that the award to each plaintiff in this class will be adjusted downward by 80% to reflect only about a 20% chance of success on the merits of these claims. The Stipulation, as amended, also fails to provide any liquidated damages to this class, on the assumption that plaintiffs will not be able to prove any willful violations. I agree with these assessments contained in the Stipulation, as amended.

d. Claims adjusters' duties appear to be directly related to management policies or general business operations

Claims adjusters are specifically mentioned [*38] in the Department of Labor regulations as a possible example of an exempt administrative employee, 29

C.F.R. § 541.205(c)(5) (as in effect before Aug. 23, 2004). It is highly unlikely that the court would find that plaintiffs are production workers. To the contrary, it is highly likely that the court would find that claims representatives engage in work "directly related to management policies or general business operations of the employer."

> The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or, in a retail or service establishment, "sales" work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

29 C.F.R. § 541.205(a). "The administrative operations of the business include the work performed by so-called white collar employees engaged in 'servicing' a business as, [*39] for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." Id. § 541.205(b). "Non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997)*.

The evidence in the instant cases strongly indicates that the Post-Training Class members are not production employees. They do not design and generate the insurance policies that Progressive sells. Rather, their activities service existing policies. See id. (insurance company marketing representatives are not production workers because they do not design and generate insurance policies); *Robinson-Smith, 323 F. Supp. 2d at 23* ("[defendant] GEICO is in the business of producing insurance policies, not damages estimates... . Estimates are therefore not the 'product' of GEICO."); n4 id. (automobile damage adjusters "are engaged in servicing the insurance policies of GEICO customers and [*40] in carrying out the policies formulated by GEICO with respect to auto damage claims").

n4 Several courts, including the Robinson-Smith court, have questioned whether the "administration/production dichotomy" has continuing analytical utility in the context of modern, post-industrial service industries. Id. at n.6 (citing *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig., 300 F. Supp. 2d 1020, 1033 (D. Or. 2003)*). The Robinson-Smith court noted that the revised 2004 Department of Labor regulations have moved away from this analysis in the context of service industries. Id. (citing *69 Fed. Reg. at 22, 262-23*).

"In the course of adjusting claims, claims representatives advise management, plan, negotiate, and represent the company. Thus, an employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with the servicing of a business even though those activities can be viewed as ancillary to the provision [*41] of a good or service." *Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1047 (C.D. Calif. 2002)* (citation omitted).

The Palacio court held, after examining the evidence presented on cross-motions for summary judgment, that the plaintiff in that case, a Progressive claims adjuster,

> regularly and continually represented Progressive during negotiations with attorneys and claimants. Moreover, she had absolute authority to settle within her limits. --She also regularly advised management regarding claims handling and related matters. Taken together, these are the types of activities contemplated as servicing a business, and thus meet the "directly related" test.

> Even taking a narrow view of the administrative/production dichotomy, we still conclude that Palacio was an administrative employee. Progressive is not in the business of claims handling. Rather, it is in the business of writing and selling automobile insurance. Claims handling occurs within a functional department as a type of ancillary customer service. "The vast majority of Progressive's customers never make a claim against the policy they purchase and therefore never come into contact with [*42] any claims personnel." As a claims representative, Palacio did not produce the very goods or services that Progressive offered to the public.

...

> ... The evidence establishes that Palacio was "advising the management, planning, negotiating, [and] representing" Progressive throughout her employment and generally "servicing" the business.

Id. (citations and footnotes omitted); see also *McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1003 (8th Cir. 2003)* (insurance claims coordinator was administrative employee exempt from FLSA overtime requirements); *Munizza v. State Farm Mut., 1996 U.S. App. LEXIS 32870, No. 95-35794, 1996 WL 711563*, at *4 (9th Cir. Nov. 7, 1996) (same as to insurance claims adjuster); *Jastremski v. Safeco Ins. Cos., 243 F. Supp. 2d 743, 758 (N.D. Ohio 2003)* (same). n5

n5 I do not find persuasive and reject the reasoning of the two California state court cases that interpreted similar, but not identical, state law provisions to the FLSA and found that claims representatives were non-exempt. *Bell v. Farmers Ins. Exch., 87 Cal. App. 4th 805, 105 Cal. Rptr. 2d 59 (2001)*; Guttierez v. State Farm Mut., No. BC-236552 (Los Angeles Superior Ct. Dec. 5, 2003).

[*43]

Much of the evidence in the instant cases is substantially similar to that in Palacio, and I find that it would very likely establish that the post-training plaintiffs were not production employees.

e. The exercise of discretion and independent judgment

As to the exercise of discretion and independent judgment, the evidence establishes that the Post-Training Class adjusters were authorized to find coverage or to recommend the denial of coverage. They investigated liability claims and determined whether the insured was partially or completely liable, or not liable at all. They determined the existence of affirmative defenses and whether to pursue recovery from a third party through subrogation. They determined or recommended a range for settling bodily injury claims and negotiated settlements based on those ranges. They set or modified reserves. They directed Progressive's counsel at arbitrations and mediations, during discovery, and at trial. For property claims, adjusters decided whether to repair or replace parts of damaged vehicles and whether to declare a total loss. They negotiated damage settlements and contracts of repair. See deposition

excerpts cited by Progressive [*44] at nn. 22-30 of its Memorandum in Support of Preliminary Approval of Settlement, Record Doc. No. 1792.

These decisions and recommendations are extremely significant to Progressive. Its claims adjusters wrote checks for claims totaling more than $ 18 billion between 1998 and 2002. Erroneous decisions concerning coverage, liability and affirmative defenses expose Progressive to significant monetary risk and affect both the ability of policy holders to obtain coverage and/or the amount of their premiums.

Adjusters compare and evaluate possible courses of conduct, evaluate the facts and law underlying each claim, make decisions or recommendations that the insured was or was not negligent based on those evaluations, make decisions or recommendations concerning the monetary value of a claim, and negotiate settlements of claims. See, e.g., exhibits and deposition excerpts cited at nn. 32-36, Record Doc. No. 1792; letter from Tammy McCutchen (the "McCutchen Letter"), Administrator, United States Department of Labor, Employment Standards Administration, Wage and Hour Division, dated November 19, 2002, Defendant's Exh. 2.

The McCutchen Letter concludes that claims adjusters are properly [*45] classified as administrative exempt employees when they (a) conducted coverage and liability investigations; (b) made coverage and liability decisions based on the facts and using their own judgment; (c) evaluated bodily injury and property damage claims based on the facts; (d) set or modified reserves; (e) negotiated with claimants, attorneys, and body shops using their judgment and discretion within their settlement authority; (f) recommended settlements in excess of their authority; and (g) negotiated settlements in excess of their usual authority after obtaining additional authority. See *Jastremski, 243 F. Supp. 2d at 753* ("The [McCutchen] letter is a thorough, well reasoned, and accurate interpretation of the regulations at issue in this case. The facts are nearly identical, and the opinion letter is less than three months old. I find that this letter deserves deference."); *In re Farmers Ins. Exchg. Claims Representatives, Overtime Pay Litig., 300 F. Supp. 2d at 1035* ("The 2002 DOL opinion letter is thorough, well reasoned, and, in this court's view, an accurate interpretation of the regulations at issue ... ; thus, it is entitled to deference, [*46] at least with respect to the interpretation of the regulations themselves.").

Thus, it strongly appears that adjusters exercise "discretion and independent judgment," n6 29 C.F.R. § 541.214(a) (as in effect before Aug. 23, 2004), sufficient to bring them within the administrative exemption.

n6 One of the written objections to the proposed settlement, filed by Scot Kuwaye of Kaneohe, Hawaii, expressly concedes this point. Record Doc. No. 1826.

f. Liquidated damages

Progressive has asserted strong affirmative defenses to liability for overtime wages. *Section 216(b) of the FLSA* authorizes liquidated damages in an amount equal to unpaid overtime. However, an employer shall not be liable if it "pleads and proves that the act complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Administrator of the Wage and Hour Division of the Department of Labor]...." *29 U.S.C. § 259.* [*47] The FLSA also provides an affirmative defense to the imposition of liquidated damages when the employer can prove that it acted in good faith and with reasonable grounds for believing it was not violating the FLSA. *Id. § 260.*

Progressive has produced evidence that it was acting in good faith in classifying its claims representatives as exempt post-training. That evidence includes data showing that almost all property casualty insurers classified their claims adjusters as exempt, and letters and opinions from the Department of Labor from which Progressive could reasonably infer that the Department of Labor approved the exempt classification for Progressive's adjusters. See deposition of Martha Conaway at p.97 & Conaway deposition exhibit 4, which are part of Defendant's Exh. 3, in globo; letter from Maria V. Ibanez dated April 29, 1996, Defendant's Exh. 7; affidavits of Veronica Buttacavoli and Robin Kraemer, Defendant's Exhs. 8 and 9.

Thus, it appears unlikely that plaintiffs will be able to prove that Progressive willfully violated the FLSA as to the Post-Training Class. A finding of a lack of willful violation would favor defendant's good faith defense as to liquidated [*48] damages.

Accordingly, I find that plaintiffs' chances of success on the merits as to the Post-Training Class are very low.

g. The Training Class has stronger claims

The Training Class members have a stronger argument that they will succeed on the merits. Department of Labor regulations specifically provide that the administrative exemption does not apply to employees training for employment in an administrative capacity who are not actually performing the duties of an administrative employee. 29 C.F.R. § 541.210 (as in effect before Aug. 23, 2004). Progressive concedes for purposes of the settlement only that its trainees "most likely" should have been classified as exempt.

The Stipulation, as amended, reflects the strenght of these claims by doubling each plaintiff's distribution, with this calculation based on his or her average weeks worked and average salary, to reflect the penalty wages to which each class member would be entitled under the FLSA, should plaintiffs prevail at trial.

On the other hand, the size of the Training Class and the time period for which its members can recover is limited by the three-year statute of limitations for [*49] willful violations and by the brief time periods of three to six weeks during which they were in training. The Konkle plaintiffs had filed a motion to apply equitable tolling to extend the recovery period back for two years before April 29, 1996, the date of a letter on which plaintiffs rely to try to establish that Progressive should have reclassified its employees in training as non-exempt as of that date. Defendant's Exh. 7. Although that motion in Konkle was dismissed as moot pending settlement discussions, a virtually identical motion in Camp was denied, Record Doc. No. 1729, and it is extremely likely that plaintiffs' motion in Konkle would also be denied.

Progressive eliminated its exempt training positions and created a non-exempt training position, effective January 1, 2002. Absent equitable tolling, any Training Class will be comprised of those who choose to opt in to the Konkle action (which has not yet been allowed because no collective action has been certified) and who went through training between, at best, September 4, 2000 (three years before the filing date of the Konkle action) n7 and December 31, 2001 (when Progressive stopped classifying [*50] its trainees as exempt).

n7 Under the FLSA, the statute of limitations is not interrupted for opt-in plaintiffs until they have filed their written consents to opt in, which the court has not yet allowed because no collective action has been certified in Konkle. The Case Management Order in Konkle set a deadline of July 20, 2004 for plaintiffs to file their motion to certify a class, with an August 18, 2004 hearing date. At that time, the court would have had to address whether to apply equitable tolling at least during the pendency of the action to the limitations period of any opt-in plaintiffs, who had been prevented by the court's own action from filing their written consents.

Nonetheless, the Stipulation, as amended, assumes the existence of a Training Class dating back to April 1996, which makes the class size vastly larger than it would be if the case proceeded to trial. The Stipulation, as amended, also assumes that plaintiffs in this class could recover liquidated damages n8 in addition to overtime [*51] pay.

n8 Progressive concedes for purposes of the settlement only that the Training Class plaintiffs could prove a willful violation.

Furthermore, defendant's evidence shows that, before January 1, 2002, adjusters generally did not work more than 40 hours per week when they were in training. Defendant's Exh. 3, Jessica Kostelac deposition at p.31; Defendant's Exhs. 15-19 (various affidavits and responses to Requests for Admissions). Plaintiffs have adduced some contrary evidence, showing that some adjusters did work more hours, particularly if study and travel time are included in the calculation.

Thus, I find that the Training Class's chances of success on the merits (assuming that a class would be certified at all) is high. I also find that the settlement proposal would compensate many more claimants over a far greater time period than would a trial on the merits.

5. *The Range of Possible Recovery*

As noted, a two-year statute of limitations applies to the claims of the Post-Training Class, pursuant to [*52] the court's order granting defendant's First Motion for Partial Summary Judgment. Record Doc. No. 1729. This limits the amount of overtime wages that these class members can recover to the two-year period before each opted in to this action. The Stipulation, as amended, also reflects the near certainty that these plaintiffs could not prove defendant's bad faith or willfulness and therefore could not recover liquidated damages.

The Post-Training Class plaintiffs have no records of overtime hours worked. Progressive's own records show that the opt-in plaintiffs in Camp worked no overtime in more than 80% of the weeks they worked, that they worked between 40 and 45 hours in another 14% of the weeks worked, that they worked between 45 and 50 hours in 2.2% of all weeks, and that they worked more than 50 hours in 1.2% of all weeks. "Statistical Comparison of Average Rate of Hours Worked for the Opt-Ins vs. Controls" by Dr. Arnold Levine, dated Jan. 19, 2004, Defendant's Exh. 12. Plaintiffs would apparently attempt to rebut the written records with testimony concerning their personal recollections of overtime hours worked.

According to Progressive's calculations, there are about [*53] 967 opt-in plaintiffs in Camp and a total of about 3,000 plaintiffs (including the opt-ins) in the Post-Training Class, including the consolidated cases. If one uses the average annual salary of all the opt-ins, adds a

component for gainsharing (a fringe benefit that claims adjusters receive), and pays overtime wages based on the categories in Dr. Levine's report, Progressive would owe the opt-ins a total of $ 2,096,433 if the class prevailed on its claims. If one then multiplies that figure by three to account for the total of approximately 3,000 plaintiffs in the Post-Training Class, and then multiplies that product by .25 to account for only a 25% chance of success, the total is about $ 1,575,000. n9 However, the proposed settlement allocates a larger amount, $ 1,686,370.90, to the Post-Training Fund.

n9 The Stipulation, as amended, postulates only a 20% chance of success and estimates the number of claimants as approximately 3,349.

The Training Class has stronger claims on the merits and would probably [*54] be able to recover liquidated damages, but its recovery would be limited to the three-to six-week time periods of class members' training. The class size would be severely limited if the statute of limitations were applied without equitable tolling. However, the Stipulation, as amended, gives the Training Class the benefit of an assumption that the limitations period extends back to April 1996, which hugely increases both the number of claimants in the class and the total amount of the Training Fund.

As plaintiffs' counsel explained at the hearing, the average overtime wages for members of the Training Class would be $ 22.73 per week for a maximum of 6 weeks, or a total of $ 136.38 per class member. When doubled to account for liquidated damages and multiplied by approximately 6,714 class members, the judgment value of this class's claims would be about $ 1,831,310.64. Thus, the Training Fund of $ 1,831,090 represents full judgment value for the Training Class. At the hearing, defense counsel concurred in the conclusion-through not the methodology by which the conclusion was reached-that the Training Fund represents the top level of the range of possible recovery for members of the [*55] Training Class.

I find that the range of possible recovery for both classes indicates that the amount offered in the settlement is fair and reasonable.

6. *The Opinions of the Class Counsel, Class Representatives and Absent Class Members*

Class Counsel and the Class Representatives participated in crafting the settlement and join in asking that it be approved by the court.

I have received only ten written objections to date. Record Doc. Nos. 1816, 1818, 1819, 1823, 1824, 1825,

1826, 1827, 1828, 1829. No objectors appeared in person at the fairness hearing.

Two objectors, Chris A. Schumacher and Gregory Sten, who filed objections before the originally scheduled hearing date, object that the amount of the settlement that will be distributed to the individual class members is inadequate. They assert that they worked substantial amounts of overtime, from 10 to 30 hours per week, for Progressive and that the proposed settlement amount per actual week worked is grossly inadequate. Schumacher also objects that awarding approximately 30% of the total settlement amount as attorney's fees is unfair to the class members.

Kyle Henson objects on the grounds that the lawsuit and [*56] any settlement thereof harms the insurance industry and the consumers of insurance products. He states that he always knew when he worked for Progressive that he would have to work more than 40 hours per week at times, but that he was a salaried employee and knew that he would not receive overtime pay for extra hours worked. He says that he usually was able to complete his work without working more than 40 hours per week. He states that some employees did work longer hours to complete their work but that they did not complain and understood that it was part of the job. Record Doc. No. 1819.

Seven more objectors filed written objections shortly before the rescheduled hearing date. Like Schumacher and Sten, these objectors complain that the amount to be distributed to each class member is so inadequate as to be unfair, when compared to the large amount of overtime they allegedly worked and the salary that they received. One of these objectors also objects that the $ 102,000 incentive payment to class representatives is excessive, especially in comparison to the small amounts that the class members will receive. Record Doc. No. 1824.

Finally, Michael R. Grey objects that he was supposed [*57] to be a class representative in the Jonas litigation that was originally filed in New York, and that he is entitled to be paid an incentive payment because he provided assistance during discovery. Record Doc. No. 1827. I am satisfied, based on the representations of plaintiffs' counsel at the hearing and my review of the record in the Jonas matter, that although Grey may have been considered at some point as a possible class representative in that litigation, he was never named as a plaintiff or a class representative in the lawsuit that was filed in New York. He has presented no evidence that he is entitled to any incentive payment. Therefore, his objection is overruled.

All of the other objections are overruled. For the most part, these objections are general laments about the

perceived unfairness of working long hours for what the objectors now deem to have been low pay. They have nothing to do with the unemotional legal factors and factual realities, divorced from sympathy or passion, that this court must consider in making its judgment. They come from only nine of the thousands of class members. Given the relevant factors discussed above, especially the very low [*58] chances of success on the merits for the Post-Training Class, I find that the amounts allocated to each class member are fair, adequate and reasonable.

## III. CLASS COUNSEL'S MOTION FOR APPROVAL OF A REASONABLE ATTORNEYS' FEE AND REIMBURSEMENT FOR COSTS EXPENDED

### A. Attorney's Fees

As part of its fairness determination, the court must also assess the reasonableness of the proposed attorney's fees. *Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 849-50 (5th Cir. 1998).* Plaintiffs' counsel seek approval of an award of attorney's fees in the total amount of $ 1,600,000. Record Doc. No. 1796. Although Progressive's agreement to pay this amount is separate and apart from Progressive's agreement to pay $ 3,800,000 into the common settlement fund, plaintiffs' counsel note that the fee award amounts to 29.62% of the total amount ($ 5,400,000) being paid by Progressive to settle these actions.

Plaintiffs' counsel do not ask that the court award the respective amounts of legal fees to each of the law firms involved in these cases because the firms have agreed to divide the lump sum award according to their private fee-sharing agreements. The Fifth Circuit [*59] has approved such a procedure. *Longden v. Sunderman, 979 F.2d 1095, 1101 (5th Cir. 1992).*

However, plaintiffs' attorneys ask the court to retain jurisdiction over the disbursement of the lump sum fees to individual counsel. They provided copies of their fee-sharing agreements to the court for in camera review. I have reviewed the fee-sharing agreements in camera, and I find that they are fair, reasonable and adequate in their allocation of the attorney's fees award and the costs in these actions, based on the actual hours worked and costs expended by each firm.

### B. Standards for Awards of Attorney's Fees

"To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees." *Strong, 137 F.3d at 849.* The Fifth Circuit uses the lodestar method for determining reasonable attorney's fees in class actions and FLSA actions. *Id. at 850; Heidtman v. County of El Paso, 171 F.3d 1038, 1043; Longden, 979 F.2d at 1100-01.*

"Although the prevailing trend in other circuits and district courts has been towards awarding fees and expenses in common [*60] fund cases based on percentage amounts, the Fifth Circuit has yet to adopt this method." *Id. at 1101 n.9.* At least seven other circuits have held that the district court has the discretion to use either the lodestar or the percentage method, *Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 49 (2d Cir. 2000)* (collecting cases), but the Fifth Circuit has not adopted that position and continues to approve the lodestar method only. *Strong, 137 F.3d at 850.* n10

> n10 I cannot agree with the Louisiana district court cases, see, e.g., *In re Harrah's Entertainment, Inc. Secs., Litig., 1998 U.S. Dist. LEXIS 18774, No. 95-3925, 1998 WL 832574, at *3 (E.D. La. Nov. 25, 1998)* (Clement, J.); *In re Combustion. Inc., 968 F. Supp. 1116, 1135 (W.D. La. 1997)* (Haik, J.), which have opined that the Fifth Circuit's case law is "at best unclear" on this issue and that the Fifth Circuit has tacitly approved the percentage method of calculating reasonable attorney's fees in a common fund settlement.
>
> Nonetheless, if the percentage approach were to be used in the instant case, I would find that the 29.6% relationship of attorney's fees to the total settlement amount is eminently reasonable. As Judge Clement noted in In re Harrah's:
>
>> The Ninth Circuit has adopted a benchmark of twenty-five percent in common fund cases. *Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).* See also [*In re Catfish Antitrust Litig., 939 F. Supp. 493 (N.D. Miss. 1996)] at 501, 503* (adopting 25% benchmark). The majority of common fund fee awards fall between twenty and thirty percent. [Citations omitted]. It is not unusual, however, for district courts in the Fifth Circuit to award percentages of approximately one third. *Combustion, 968 F. Supp. at 1133.*
>
> *In re Harrah's, 1998 U.S. Dist. LEXIS 18774, 1998 WL 832574, at *4;* see also *In re Prudential-Bache Energy Income P'ship Secs.*

*Litig., 1994 U.S. Dist. LEXIS 2778, No. MDL 888, 1994 WL 150742, at \*1 (E.D. La. Apr. 13, 1994)* (Livaudais, J.) ("Historically, fee awards in common fund cases such as this were computed based upon a percentage of the fund, typically in the 25% to 33% range ... The percentage fee award was intended to approximate the market--what private counsel ordinarily would charge in a contingent fee contract."). In Longden, the Fifth Circuit affirmed the district court's fee award of 27.5% of the settlement fund, which was supported by the court's analysis of the Johnson factors. *Longden, 979 F.2d at 1100*. Judge Clement awarded attorney's fees of 26% in *In re Harrah's, 1998 U.S. Dist. LEXIS 18774, 1998 WL 832574, at \*7*. In *Combustion, 968 F. Supp. at 1136*, an extraordinarily complex, multidistrict class action, Judge Haik set a maximum reserve of 36% for attorney's fees.

[*61]

Determination of reasonable attorney's fees is a two-step process that begins with determination of the lodestar amount.

> A lodestar is calculated by multiplying the number of hours reasonably expended by an appropriate hourly rate in the community for such work. After making this calculation, the district court may decrease or enhance the lodestar based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)*. The lodestar may not be adjusted due to a Johnson factor, however, if the creation of the lodestar award already took that factor into account. Such reconsideration is impermissible double-counting.

*Heidtman v. County of El Paso, 171 F.3d 1038, 1043 (5th Cir. 1999)* (citing *City of Burlington v. Dague, 505 U.S. 557, 562, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992); Shipes v. Trinity Indus., 987 F.2d 311, 319-20 (5th Cir. 1993))*.

The Johnson factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the

skill required to perform the legal services properly; (4) the preclusion of other [*62] employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the award in similar cases.

*Johnson, 488 F.2d at 717-19*.

"Of the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." *Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998)* (citation omitted). Three of the Johnson factors, complexity of the issues, the results obtained, and preclusion of other employment, are fully reflected and subsumed in the lodestar amount. *Heidtman, 171 F.3d at 1043* (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 92 L. Ed. 2d 439, 106 S. Ct. 3088 (1986); Shipes, 987 F.2d at 319-22 & n.9)*. After [*63] Johnson was decided, the "Supreme Court has barred any use of the sixth factor," whether the fee is fixed or contingent. *Walker v. United States Dep't of Housing & Urban Dev., 99 F.3d 761, 772 (5th Cir. 1996)* (citing *City of Burlington, 505 U.S. at 567; Shipes, 987 F.2d at 323)*.

"The lodestar ... is presumptively reasonable and should be modified only in exceptional cases." *Watkins v. Fordice, 7 F.3d 453, 457 (5th Cir. 1993)* (citing *City of Burlington, 505 U.S. at 562)*; accord *Heidtman, 171 F.3d at 1043*. Although the party seeking attorney's fees bears the initial burden of submitting adequate documentation of the hours reasonably expended and of the attorney's qualifications and skill, the party seeking reduction of the lodestar bears the burden of showing that a reduction is warranted. *Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983); Wegner v. Standard Ins. Co., 129 F.3d 814, 822 (5th Cir. 1997); Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 329 (5th Cir. 1995)* (hereinafter "LP&L"). In the instant [*64] cases, Progressive does not seek any reduction.

C. The Hourly Rates Charged by Plaintiffs' Counsel

First, I must determine whether the hourly rates charged by plaintiffs' counsel were reasonable. Six law

firms acted as the plaintiffs' Steering Committee and seven other firms acted as local counsel in the consolidated cases.

Plaintiffs' counsel seek rates of $ 225 per hour for the work of each partner, $ 140 for the work of each associate, and $ 60 per hour for paralegal work. They submit that these hourly rates are within the prevailing market rates within the New Orleans legal community for similar services by lawyers of reasonably comparable skills, experience and reputation.

An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates and the rate is not contested. *LP&L, 50 F.3d at 328.* Based on my knowledge of the prevailing market rates in this legal community, my familiarity with the qualifications and expertise of plaintiffs' counsel, and recent awards of reasonable attorney's fees in this district, I find that [*65] the requested rates of $ 225 for partners and $ 140 for associates are reasonable. *Green v. Administrators of Tulane Educ. Fund, 284 F.3d 642, 662 (5th Cir. 2002); Henderson, 2002 U.S. Dist. LEXIS 10840, 2002 WL 31415728, at *5; United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 46 F. Supp. 2d 546, 569 (E.D. La. 1999)* (Duval, J.), vacated on other grounds, *244 F.3d 486 (5th Cir. 2001); Yousuf v. UHS of De La Ronde, Inc., 110 F. Supp. 2d 482, 490-91 (E.D. La. 1999)* (Livaudais, J.).

It is well established that fees for paralegal time are recoverable. *Missouri v. Jenkins, 491 U.S. 274, 288, 105 L. Ed. 2d 229, 109 S. Ct. 2463 (1989); Volk v. Gonzalez, 262 F.3d 528, 535 (5th Cir. 2001); Walker, 99 F.3d at 773; Associated Builders & Contractors of La., Inc. v. Orleans Parish Sch. Bd., 919 F.2d 374, 380 (5th Cir. 1990).* Again, based on my experience in this legal community, I find that $ 60 per hour for paralegal time is reasonable.

D. The Hours Charged by Plaintiffs' Counsel

Next, I must determine the reasonable number of hours that Class Counsel expended on the litigation. [*66] As a general proposition, all time that is excessive, duplicative or inadequately documented should be excluded. *Watkins 7 F.3d at 457.*

Plaintiffs' counsel have submitted the affidavits of Edward J. Castaing and Jonathan M. Herman, partners in the firm Crull, Castaing, Lilly & Herman, n11 and James M. Jacobs, a partner in the firm Murphy, Rogers & Sloss, who acted as co-lead counsel in Camp and Konkle. Castaing, Herman and Jacobs attest to the number of attorney and paralegal hours expended by their respective firms and aver that the hours were expended for the benefit of the Class, were reasonably necessary for the prosecution of this action and were neither excessive nor duplicative. Record Doc. No. 1796, Plaintiff's Exhs. B, C.

n11 Mr. Herman recently left the firm.

Although plaintiffs' counsel have submitted affidavits attesting only to the hours expended by these two lead firms (which total 3,999.37 partner hours, 340 associate hours and 730.70 paralegal hours), their motion asserts [*67] that the time records of all the firms who worked on these cases reflect that partners expended a total of 6,217.09 hours, associates expended a total of 1,458.65 hours and paralegals expended a total of 1,252.97 hours over the almost three-year time span of this litigation. These hours are undisputed and no objections to the hours have been filed. Based on my own participation and my knowledge of the various attorneys' participation in these cases, I find that the requested hours were reasonable and necessary and neither excessive nor duplicative, given the complexity of this class litigation.

Applying the approved hourly rates to these hours expended results in the following lodestar amount.

| Partners: | 6,217.09 hours | @ $ 225/hr.= | $ 1,398,845.25 |
| Associates: | 1,458.65 hours | @ $ 140/hr. = | $ 204,211.00 |
| Paralegals: | 1,252.97 hours | @ $ 60/hr. = | $ 75,178.20 |
| TOTAL | | | $ 1,678,234.45 |

This amount exceeds the requested attorney's fees of $ 1,600,000.

The court next applies the Johnson factors, as amended by subsequent case law, to the lodestar amount.

The Johnson factors have been evaluated as follows: (1) the time and labor required have [*68] already been considered; (2) the legal issues were neither novel nor especially difficult but the procedural and factual issues were complex; (3) the skill required to perform the legal

services properly has already been considered; (4) although class counsel presented no evidence on this factor, they assert that the total attorney hours expended demonstrate, and I find, that they were precluded from handling other employment; (5) the customary fee has already been considered; (6) whether the fee is fixed or contingent is no longer a permissible factor; (7) there were no particular time limitations imposed by the client or circumstances; (8) the amount involved was extraordinary, although not necessarily for class litigation, and the results obtained were reasonably successful; (9) the experience, reputation and ability of the attorneys have already been considered; (10) the case was not undesirable; (11) the nature and length of the professional relationship with the client is not a factor; and (12) the awards in similar cases are not relevant because the lodestar amount here depends on the actual hours worked and hourly rate of pay. I find that no adjustment need be made to the lodestar. [*69]

I further find that the requested attorney's fees award of $ 1,600,000 is reasonable and is actually lower than the lodestar would support.

E. Costs

In their motion, plaintiffs' counsel seek to recover their actual costs of $ 186,204.78. They have attached to their motion copies of billing records from each law firm that represented plaintiffs, which detail the expenditures made. Record Doc. No. 1796, Plaintiff's Exhs. A-1 through A-13. The parties orally amended the Stipulation in open court during the hearing to stipulate that plaintiffs' counsel may recover $ 186,204.78 in costs, which Progressive will pay, and they will file a written amendment to that effect.

"Costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *Fed. R. Civ. P. 54(d)*; accord *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp., 71 F.3d 198, 205 n.5 (5th Cir. 1995)*. A party who obtains a favorable judgment on some of its claims may be regarded as a prevailing party, even if it has not sustained all of its claims. Id. Taxation of costs under *Rule 54(d)* is within the district [*70] court's discretion. *Breaux v. City of Garland, 205 F.3d 150, 164 (5th Cir. 2000)*. Although there is no "prevailing party" when a case settles, these principles indicate that plaintiffs' counsel should recover their costs expended in reaching a successful, fair and reasonable settlement in these actions.

I find that the expenses to which counsel stipulated of $ 186,204.78 are reasonable and were necessarily incurred in prosecuting this litigation.

CONCLUSION

For all of the foregoing reasons, IT IS ORDERED that the Post-Training Class and the Training Class, as defined herein, are certified for settlement purposes only.

IT IS FURTHER ORDERED that all objections to the Stipulation of Class Action Settlement and Release, as amended, are OVERRULED.

IT IS FURTHER ORDERED that the Stipulation of Class Action Settlement and Release, as amended, is APPROVED. The parties agreed orally at the hearing to amend the Stipulation to provide that no funds will be distributed to any class members or attorneys until the 30-day appeal period has run from the date of entry of this order. Accordingly, this action is hereby conditionally dismissed, without prejudice to the [*71] right, upon good cause shown within a reasonable time, to seek summary judgment enforcing the settlement, if it is not consummated. The court specifically approves the terms of the settlement agreement and incorporates those terms into the order of dismissal. The court retains jurisdiction over the parties and their settlement agreement, including the fee-sharing agreements between counsel for the class members, for purposes of enforcing that agreement, should any controversy arise about the terms of the agreement or any party's performance of its obligations under the agreement. *Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 378, 128 L. Ed. 2d 391, 114 S. Ct. 1673 (1994)*.

IT IS FURTHER ORDERED that a final order DISMISSING all claims of all plaintiffs and class members in these actions with prejudice will be issued upon the court's receipt of a motion to dismiss filed by the Class Representatives, following the mailing of the settlement payments by the Claims Administrator pursuant to the Stipulation, as amended.

IT IS FURTHER ORDERED that Class Counsel's Motion for Approval of a Reasonable Attorneys' Fee and Reimbursement for Costs Expended, Record Doc. No. 1796 in C.A. [*72] No. 01-2680, is GRANTED, as provided and clarified herein. Because plaintiffs' counsel have not yet calculated the specific amounts or agreed upon the logistical manner in which their fees and costs are to be distributed among themselves, IT IS ORDERED that Progressive shall deposit $ 1,600,000 in reasonable attorney's fees and $ 186,204.78 in costs into the registry of this court, and these funds will be distributed among plaintiffs' counsel only upon their motion and further order of the court.

New Orleans, Louisiana, this 23rd day of September, 2004.

JOSEPH C. WILKINSON, JR.

UNITED STATES MAGISTRATE JUDGE

3

LEXSEE 2001 U.S. DIST. LEXIS 25532

**PASQUALE DI GIACOMO, et al., Plaintiffs v. PLAINS ALL AMERICAN PIPELINE, et al., Defendants; BILL KOPLOVITZ, et al., Plaintiffs v. PLAINS RESOURCES, INC., et al., Defendants**

**CIVIL ACTION NO. H-99-4137 (Consolidated), CIVIL ACTION NO. H-99-4212 (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2001 U.S. Dist. LEXIS 25532*

**December 18, 2001, Decided**
**December 19, 2001, Entered**

**DISPOSITION:** Proposed settlement agreement analyzed.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For PASQUALE DI GIACOMO, plaintiff: Sherrie R Savett, Berger Montague, Philadelphia, PA. Thomas E Bilek, Hoeffner Bilek & Eidman, Houston, TX. Helen J Hodges, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA. Amber L Eck, Milberg Weiss et al, San Diego, CA. Richard D Kranich, Attorney at Law, New York, NY. Karen S Orman, Berger and Montague PC, Philadelphia, PA. Keith F Park, Milberg Weiss et al, San Diego, CA.

For BILL KOPLOVITZ, plaintiff: John G Emerson, Jr, The Emerson Firm, Houston, TX. Steven E Cauley, Cauley Geller et al, Little Rock, AR. Karen S Orman, Berger and Montague PC, Philadelphia, PA. Keith F Park, Milberg Weiss et al, San Diego, CA.

For MICHAEL S COHEN, HOWARD D WALKER, plaintiffs: Sherrie R Savett, Berger Montague, Philadelphia, PA. William S Lerach, Milberg Weiss et al, San Diego, CA. roger B Greenberg, Schwartz Junell et al, Houston, TX. Max L Berger, Bernstein Litowtz et al, New York, NY. Robert N Kaplan, Kaplan Kilsheimer et al, New York, NY. Karen S Orman, Berger and Montague PC, Philadelphia, PA. Keith F Park, Milberg Weiss et al, San Diego, CA.

For LYNDAL H WALKER, LAWRENCE S MILLER, MARION A MILLER, JOHN W KELLY, III, plaintiffs: Sherrie [*2] R Savett, Berger Montague, Philadelphia, PA. William S Lerach, Milberg Weiss et al, San Diego, CA. roger B Greenberg, Schwartz Junell et al, Houston, TX. Max L Berger, Bernstein Litowtz et al, New York, NY. Robert N Kaplan, Kaplan Kilsheimer et al, New York, NY. Karen S Orman, Berger and Montague PC, Philadelphia, PA.

For JOANNA LERNER, plaintiff: Richard D Greenfield, Greenfield & Chimicles, Haverford, PA. Karen S Orman, Berger and Montague PC, Philadelphia, PA.

For KAREN LEFORT, JUDITH BARRY, HOWARD KESSLER, ERNEST WOHLFARTH, ANN GOLDHIRSCH, JULES FRANKS, consolidated plaintiffs: roger B Greenberg, Schwartz Junell et al, Houston, TX.

For DAVID CROSSEN, consolidated plaintiff: Sherrie R Savett, Berger Montague, Philadelphia, PA. William S Lerach, Milberg Weiss et al, San Diego, CA. roger B Greenberg, Schwartz Junell et al, Houston, TX. Max L Berger, Bernstein Litowtz et al, New York, NY. Robert N Kaplan, Kaplan Kilsheimer et al, New York, NY.

For CAROLINE TEITELBAUM, PEGGY ANN WELT, MORTON H MAILMAN, consolidated plaintiffs: Thomas E Bilek, Hoeffner Bilek & Eidman, Houston, TX.

For HARVEY GREENFIELD, consolidated plaintiff: Larry Richard Veselka, Smyser Kaplan [*3] et al, Houston, TX.

For GARY KOSSEFF, consolidated plaintiff: Thomas M Melsheimer, Fish and Richardson, Dallas, TX.

For JERRY BLUE'S CARPETLAND INC. ON BEHALF OF ITSELFT AND ALL OTHERS SIMILARLY SITUATED, consolidated plaintiff: roger B Greenberg, Schwartz Junell et al, Houston, TX. Arthur L Shingler, III, Findelstein & Krinsk, San Diego, CA.

For PLAINS ALL AMERICAN PIPELINE LP, GREG L ARMSTRONG, PHILLIP D KRAMER, defendants: A Ross Rommell, Jr, Andrews & Kurth, Houston, TX.

For PLAINS RESOURCES INC, HARRY N PEFANIS, consolidated defendants: A Ross Rommell, Jr, Andrews & Kurth, Houston, TX.

For SALOMON SMITH BARNEY INC, DONALDSON LUFKIN & JENRETTE SECURITIES CORPORATION, A.G. EDWARDS & SONS INC, GOLDMAN SACHS & CO, DAIN RAUSHER WESSELS, ING BARING FURMAN SELZ LLC, FIRST UNION SECURITIES INC, consolidated defendants: Christopher Gette, Skadden Arps et al, New York, NY.

JUDGES: Lee H. Rosenthal, United States District Judge.

OPINIONBY: Lee H. Rosenthal

OPINION:

### MEMORANDUM AND OPINION

The parties in these related securities class actions reached agreements to settle and have applied for an award of attorney fees and reimbursement of expenses. This court held a hearing [*4] on the application for fees and requested supplemental information as to the work performed by the law firms seeking fees and expenses. That information was provided. No objections to the settlement or fees have been filed. Based on the record, the evidence, the arguments of counsel, and the applicable law, this court analyzes the settlement and resolves the request for fees and expenses, as set out below.

### I. Background

Plains All American Pipeline, L.P. (PAAP) was a publicly traded Delaware limited partnership formed in 1998 to acquire and operate certain crude oil business and assets of Plains Resources, Inc. (PRI). Plains All American, Inc., a wholly-owned subsidiary of PRI, was PAAP's general partner. PRI explores, acquires, develops, and exploits crude oil and natural gas properties, and, through its operation of PAAP, is involved in marketing, transporting, terminalling, and storing crude oil. PRI owned a majority of the PAAP units.

PAAP made an Initial Public Offering in November 1998 and a Secondary Offering in October 1999. On November 26, 1999, PAAP announced a loss of over $ 160 million due to previously undisclosed oil trades. As a result, PAAP would likely [*5] restate its financial results for the first three quarters of 1999 to report losses approximating $ 100 million. The price of PAAP Units and the price of PRI common stock dropped precipitously following the disclosure. On March 30, 2000, PAAP released the restatement of its previously reported financial results for 1998 and 1999. The restatement recognized approximately $ 7.1 million in trading losses for 1998 and $ 166.4 million for 1999. Net income for 1998 was reduced by $ 2.4 million; for the first quarter of 1999, by $ 21.4 million; for the second quarter of 1999, by $ 21.2 million; and for the third quarter of 1999, by $ 72.2 million. PRI's financial results were also, and similarly, restated.

On or after November 29, 1999, twenty separate class actions were filed on behalf of individuals who purchased the limited partnership units of PAAP and/or the common stock and options of PRI during specific periods. The suits initially named as defendants PAAP, PRI, and individuals who served as officers and/or directors. Several of the officers served dual roles as officers of both PRI and PAAP.

Consolidated and amended class actions complaints were filed in both the *DiGiacomo* and [*6] *Koplovitz* actions. The *DiGiacomo* complaint alleged class actions claims on behalf of all persons who purchased the common limited partnership units of PAAP from November 18, 1998 to November 26, 1999. The *Koplovitz* complaint alleged class actions claims on behalf of all persons who purchased the common stock or call options of PRI from October 29, 1998 to November 26, 1999.

Investigation and discovery conducted before and after the suits were filed revealed a number of highly speculative crude oil contracts entered into by a single trader. Those transactions featured a large number of positions kept "open" for extended periods. Investigation and discovery was conducted into the internal controls at PAAP and PRI for monitoring traders and trades and for setting and enforcing limits on those trades. That work focused on the extent to which the losses resulted from

the individual trader's deliberate steps to bypass the controls and conceal the nature and extent of his trades; from the inadequacy of the controls or their application; or from other factors unrelated to the trading losses.

In the Consolidated and Amended Class Complaint filed in the *DiGiacomo* case, the [*7] named plaintiff alleged violations of sections 11 and 15 of the Securities Act of 1933, *15 U.S.C. § § 77k and 77o*, and sections 10(b) and 20(a) of the Securities Exchange Act of 1934, *15 U.S.C. § § 78j(b) and 78t(a)*, and the rules and regulations promulgated thereunder. In the *Koplovitz* complaint, the named plaintiff alleged violations under sections 10(b) and 20(a) of the 1934 Act and the implementing rules and regulations. The *DiGiacomo* complaint alleged materially false and misleading statements and omissions in the Registration Statements and Prospectuses issued in connection with PAAP's IPO and Secondary Offering, in violation of section 11 of the 1933 Act. The complaint alleged that in the November 17, 1998 IPO Prospectus and the October 1, 1999 Secondary Offering Prospectus, defendants specifically stated that PAAP did not take positions in its oil trades that were intended to speculate on oil price changes; did not engage in speculative futures trading that could expose the Partnership to indeterminable losses; and was able to monitor trading. The Prospectuses included financial results that failed to represent the risks and [*8] losses from the speculative oil trading that PAAP was actually engaging in through traders whose activities were not understood or stopped. The Prospectuses included statements as to PAAP's earnings and profits in the first three quarters of 1999 that, as a result of the liabilities resulting from its trading activities, were without reasonable basis.

Both the *DiGiacomo* and *Koplovitz* complaints alleged that the defendants knowingly or recklessly released materially false and misleading information to the investing public, in violation of *section 10(b) of the 1934 Act and rule 10b-5*. In *DiGiacomo*, the plaintiffs alleged that the class period extended from November 17, 1998, the date the IPO issued, through November 26, 1999. In *Koplovitz*, the plaintiffs alleged a class period from October 29, 1998, the date that PRI announced its financial results for the third quarter ending September 30, 1998, through November 26, 1999. In both suits, plaintiffs alleged that because defendants' disseminated materially false and misleading information, the prices of the PAAP Units and PRI common stock and call options were artificially inflated throughout the class periods. As to the [*9] individual defendants, plaintiffs in both cases alleged that certain of these defendants engaged in the scheme to conceal the oil trading losses in order to prevent price declines in the PAAP Units and the PRI shares.

On April 27, 2000, this court appointed lead plaintiffs to pursue the claims on behalf of purchasers of PAAP Units, and approved the Plains All American Lead Plaintiffs' Group's selection of Berger & Montague, P.C., Milberg Weiss Bershad Hynes & Lerach LLP, Kaplan Kilsheimer & Fox and Bernstein Liebhard & Lifshitz LLP as Plaintiffs' Executive Committee; Berger & Montague, P.C., and Milberg Weiss Bershad Hynes & Lerach LLP as Co-Chairman of the Executive Committee; and Greenberg Peden P.C. as Plaintiffs' Liaison Counsel pursuant to *section 21D(a)(3)(B)(v) of the Exchange Act. This* court also granted the motion of the Plains Resources Plaintiffs' Group to be appointed lead plaintiffs to pursue claims on behalf of purchasers of PRI common stock and options, and approved Cauley & Geller, Bowman & Coates, LLP as lead counsel and Whittington, Von Sternberger, Emerson & Wilsher, LLP as plaintiffs' liaison counsel.

During the investigation and discovery, the parties did not [*10] take depositions. However, the plaintiffs propounded extensive document requests. The requests included documents relating to the crude oil contracts that plaintiffs contended led to the losses that, in turn, caused the restatements of revenue and income. The requests also included PAAP's internal documents relating to its controls over such trading activities. The documents included the statements made to the SEC and NASDAQ/AMEX relating to the trading losses and restated revenue and income. The informal discovery included interviews with certain of the individual defendants concerning trading activity, internal controls in place to monitor the traders and trades, and the extent to which the internal controls had been implemented and enforced. Counsel for plaintiffs retained experts in accounting to determine the extent to which the financial statements violated generally accepted accounting principles and contained false and misleading statements. Counsel for both sides also retained experts in accounting and damages to determine the extent to which damages could be proven in light of subsequent increases in the price of PAAP stock after the end of the class periods.

The parties [*11] engaged in extensive arms-length settlement negotiations. Prolonged and repeated discussions involved detailed presentations on both liability and damages issues. The disputed issues included the following:

1. As to the section 11 claim involving the PAAP Units, the plaintiffs faced uncertainty as to the effect on damages from the fact that within a relatively short time after PAAP and PRI disclosed the trading losses, the price of the units rebounded dramatically.

2. As to liability with respect to the claims under *sections 10(b) and 20(a)* of the 1934 Act and *rule 10b-5*, plaintiffs' investigation revealed facts that would complicate proof of scienter. Specifically, the investigation and informal discovery revealed that PAAP did have in place a system of internal controls and reporting requirements to monitor traders; a particular trader had deliberately and deceitfully bypassed those controls to conceal his transactions; as a result, defendants would be able to present evidence that they did not know that this trader was engaging in certain types of transactions; and defendants did not know the extent to which those transactions were speculative. Such evidence presented plaintiffs [*12] with difficulties in proving the element of scienter and would have assisted defendants in asserting a good faith defense to claims of control person liability.

After extensive negotiations, the parties entered into a settlement agreement resolving all claims. The proposed settlement consisted of $ 24.1 million in cash in the *DiGiacomo* case, a recovery of approximately 48 percent of the likely provable damages. The *Koplovitz* action was settled for $ 5.4 million in cash, a recovery of approximately 39 percent of the most likely provable damages. The difference in part reflected that as to the claims based on the PAAP Units, proof of scienter was not required. The settlement funds have been earning interest at the six-month T-Bill rate since October 1, 2000.

Following a hearing, this court provisionally certified a settlement class in the *DiGiacomo* action, consisting of all persons who did not request exclusion by February 15, 2001 who purchased PAAP Units during the class period, and in the *Koplovitz* action, consisting of all persons who did not request exclusion by February 15, 2001 who purchased PRI common stock and call options during the class period. Class Notice [*13] was initially mailed to over 595 class members and nominees in the *DiGiacomo* case, which amounted to the distribution of notice to a total of 19,335 prospective class members. Summary notice was also provided by industry publication. Ten class members requested exclusion, representing approximately .03 percent of the PAAP Units in the class. In the *Koplovitz* case, class notice was mailed to 431 class members and nominees, amounting to distribution of notice to a total of 2,051 prospective class members. One class member opted out, representing approximately .09 percent of the shares in the class. No objections were filed.

The parties submitted, and the court preliminarily approved, a plan for computing class members' claims and distributing the settlement proceeds in accordance with timely proofs of claim submitted by class members. This court conducted a fairness hearing to determine whether to approve the proposed settlement. *See FED.R.CIV.P. 23(e)*. After considering the testimony at the hearing, the lengthy memoranda and exhibits submitted prior to the hearing, the failure of any class member to file objections to the proposed [*14] settlement, and the virtual absence of requests for exclusion from the classes, this court concluded that the proposed settlement is fair to the class members. The case presented significant risks of no recovery, or of limited recovery, based on the difficulties in proving scienter and in establishing damages. The litigation would have been prolonged, with extensive motions practice and inevitable appeals. Given the uncertainty of success in litigation, or success but involving a recovery of a small amount of the damages sought, and the certainty of prolonged litigation absent settlement, the $ 29.5 million cash settlement amount, achieved in approximately one and one-half years, was a fair, reasonable, and adequate settlement. *See In re Lease Oil Antitrust Litig., 186 F.R.D. 403, 431 (S.D.Tex. 1999)*(stating that when considering a proposed settlement, a district court should consider the follow six factors: "(1) the assurance that there is no fraud or collusion behind the settlement; (2) the state of the proceedings and the amount of discovery completed; (3) the probability of plaintiff's success on the merits; (4) the range of possible recovery; (5) the complexity, [*15] expense, and likely duration of the litigation; and (6) the opinions of the class counsel, class representatives, and absent class members")(quoting *Reed v. General Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983)*).

This court took the issue of attorney fees under submission and requested additional information from the attorneys. Counsel have submitted additional information as to the number of hours, hourly rates, and work performed by the numerous different law firms representing plaintiffs. The attorneys have also submitted information based on the completed claims administration. The total amount of valid claims submitted in *DiGiacomo* is $ 12,784,165.80, and, in *Koplovitz*, $ 3,738,970.00. As a result, this court has the assurance of knowing that awarding the amount of fees requested will still provide class members who have submitted claims the full amount, or more, of their allowable claims.

Counsel requested this court to rule on the issue of attorney fees and to issue the final orders releasing the funds. Plaintiffs' counsel argue for attorney fees of thirty percent of the total recovery, plus expenses of $ 187,667.57 (in *DiGiacomo*) and $ 19,838.63 [*16] (in *Koplovitz*), plus interest.

## II. Analysis

### A. The Method for Determining Attorney Fees

Most courts use the percentage of the fund method in awarding fees in common fund class actions. *See, e.g., Camden I Condominium Assoc., Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991)*("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class"); *Swedish Hospital Corp. v. Shalala, 303 U.S. App. D.C. 94, 1 F.3d 1261 (D.C. Cir. 1993)*(holding that in common fund class actions, percentage of the fund method is the only permissible method of award of attorney fees). The Supreme Court has indicated that the percentage fee method is a proper method of calculating attorney fees in a common fund case. *See Blum v. Stenson, 465 U.S. 886, 900 n. 16, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984); Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980)* ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. [*17] ").

Other courts use the lodestar approach, which requires the court to compute the "lodestar" by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Strong v. Bellsouth Telecommunications, Inc., 137 F.3d 844, 850 (5th Cir.1998)*. The court may then apply a multiplier to the lodestar, adjusting the lodestar either up or down. *Id.* The Fifth Circuit has stated that "this circuit uses [the lodestar method] to assess attorneys' fees in class action suits." *Strong, 137 F.3d at 850*. Clearly, however, the Fifth Circuit recognizes the propriety of the percentage fee method where each member of a class has an "undisputed and mathematically ascertainable claim to part of [a] judgment." *See id. at 852* (quoting *Boeing, 444 U.S. at 479, 100 S. Ct. at 748*). A district court in the Fifth Circuit has discretion in determining whether to apply the percentage fee or lodestar method. *See In re Combustion, Inc., 968 F. Supp. 1116, 1135 (W.D.La.1997)*.

Numerous district courts in the Fifth Circuit have applied the percentage fee method to common fund cases. *See, e.g., Faircloth v. Certified Finance, Inc., 2001 U.S. Dist. LEXIS 6793, 2001 WL 527489 at *9 (E.D.La. May 16, 2001)* [*18] (calculating fees under both percentage fee method and lodestar method); *Shaw v. Toshiba America Info. Sys., Inc., 91 F. Supp. 2d 942 (E.D.Tex. 2000); In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D.Tex. 1999)*(applying percentage fee method with lodestar cross-check); *In re Harrah's Entertainment, Inc., 1998 U.S. Dist. LEXIS 18774, 1998 WL 832574 at *4 (E.D.La. Nov. 25, 1998); Combustion, 968 F. Supp. at 1135; In re Catfish Antitrust Litig., 939 F. Supp. 493, 500 (N.D.Miss. 1996); In re Prudential-Bache Energy Income P'ship Sec. Litig., 1994 U.S. Dist.* LEXIS 4786, No. 888, 1994 WL 150742 at *4 (E.D.La. Apr. 13, 1994)*.

In a 1985 Third Circuit Task Force Report, prominent judges and practitioners explained why attorney fee awards in common fund cases should be based on the percentage fee method. Task Force Report, *108 F.R.D. 237, 254-59 (1986)*. The Report identified a number of deficiencies with the lodestar method, including: (1) increasing the workload of the judicial system; (2) lack of objectivity; (3) a sense of mathematical precision unwarranted in terms of the realities of [*19] the practice of law; (4) ease of manipulation by judges who prefer to calculate the fees in terms of percentages of the settlement fund; (5) encouraging duplicative and unjustified work; (6) discouraging early settlement; (7) not providing judges with enough flexibility to award or deter lawyers so that desirable objectives, such as early settlement, will be fostered; (8) providing relatively less monetary reward to the public interest bar; and (9) confusion and unpredictability in administration. Task Force Report, *108 F.R.D. at 246-49*. A 2001 Third Circuit Task Force, examining class counsel selection methods based on ex ante fee determinations, has issued a draft report, again concluding that attorney fee awards in common fund cases should be based on the percentage of fund, rather than lodestar, approach:

> The 1985 Task Force Report made a compelling case for rejecting the lodestar in common fund cases. We see nothing that has changed in the interim to diminish the power of the arguments made in 1985. The lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the [*20] class. Moreover, use the lodestar may result in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more effective with a lesser expenditure of time.

Draft Task Force Report, p. 105. The benefits of the percentage fee method include readily ascertainable fee amounts that align the interests of class counsel with those of the class members. *See Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.), 243 F.3d 722 (3d Cir. 2001); see also Rawlings v.*

*Prudential-Bache Properties, Inc., 9 F.3d 513, 516 (6th Cir.1993); Shalala, 1 F.3d at 1267-71.*

Despite the apparent advantages of the percentage fee method over the lodestar method in common fund cases, the law in the Fifth Circuit concerning which method should be applied is "at best unclear." *Combustion, 968 F. Supp. at 1134.* District courts in the Fifth Circuit have exercised discretion in determining which method to use. *Id. at 1135.* In 1974, the Fifth Circuit articulated twelve [*21] factors to be examined in setting attorney fees. *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, (5th Cir.1974).* The *Johnson* factors are: (1) time and labor required; (2) novelty and difficulty of the issues; (3) skill required to perform the legal services properly; (4) preclusion of other employment; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of professional relationship with the client; and (12) awards in similar cases. *Id. at 717-19.* Under either method, the Fifth Circuit requires that the award be supported by the *Johnson* factors. *Combustion, 968 F. Supp. at 1135.*

Some courts have attempted to obtain the benefits of both methods by applying the percentage of the fund method and using the lodestar as a cross-check to ensure that the percentage awarded does not create an unreasonably high fee. *See In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001).* The goal [*22] of such an application is "to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *Id. at 285.* The Tenth Circuit has expressed a preference for the percentage of the fund method, but looks at the *Johnson* factors to determine which percentage to apply in a given case. *Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir.1994)*(citing *Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 853 (10th Cir.1993)).* In using a lodestar approach as a cross-check when awarding a percentage of the fund, a court often uses a summary of the hours expended by counsel at various stages, with less detailed breakdown than a straightforward application of the lodestar method as the primary basis for determining the appropriate fee. Such a cross-check enables the court to make a more reliable judgment as to whether the percentage appears too high or low, given the time required by the case. *Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions), 148 F.3d 283, 340-41 (3d Cir.1998)*(cited in [*23] *In re Cendant Corp. Litig., 264 F.3d at 284-85).*

In this case, counsel have requested the court to apply the percentage fee method and award thirty percent of the class fund in both classes. This court requested, and counsel provided, a summary of the hours, work, and hourly rates for the lawyers who will benefit from the fees awarded. Based on these documents and the entire record, this court will use the percentage of the fund method, accompanied by a "lodestar cross-check." This approach is based on the conclusion that application of the lodestar method by itself is unlikely to result in a more reasonable award of fees; would be unduly burdensome; would require the court to set reasonable rates for the attorneys of a large number of different firms and to review extensive itemized billing records in order to determine whether the 4,709 hours reflected in the summary records submitted were reasonably expended.

The method of analysis selected requires a determination of the percentage to be applied. Counsel urges that thirty percent is a recognized "benchmark." The status of any percentage as a "benchmark" has recently been the subject of increased scrutiny from [*24] both the bench and in the academy. That critical analysis must be balanced by a recognition of the reasonable expectations of counsel, formed when the cases were filed, developed, and settled.

**B. Setting a Percentage**

Counsel argue for the recognition and application of a thirty percent benchmark for the $ 24.1 million fund in the *DiGiacomo* case and the $ 5.4 million fund in the *Koplovitz* case, for a total of $ 8.85 million. A number of cases recognize a benchmark of between twenty and thirty percent in common fund cases. The Ninth Circuit has adopted a benchmark of twenty-five percent in common fund cases. *Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir.1993). See also Catfish, 939 F. Supp. at 501, 503* (adopting a 25 percent benchmark). A number of common fund fee awards in post-PLSRA cases fall between twenty and thirty percent. *See, e.g., Gwozdzinnsky v. Sandler Assocs., 159 F.3d 1346 (2d Cir. Mar. 13, 1998)*(unpublished table opinion)(affirming award of twenty-five percent in $ 2 million securities settlement); *In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D.Pa.2000)* [*25] (awarding thirty percent in $ 111 million securities fraud settlement); *Kurzweil v. Philip Morris Cos., 1999 U.S. Dist. LEXIS 18378, 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999)*(awarding thirty percent in $ 123.8 million securities fraud settlement); *Fournier v. PFS Invs., Inc., 997 F. Supp. 828, 832 (E.D.Mich.1998)*(awarding twenty percent in $ 7.5 million securities fraud settlement); *see also* Docket Entry No. 80 at 15-16 (listing unpublished opinions awarding twenty to thirty percent in post-PLSRA securities cases).

Recent study has cast doubt on the assumption that fees awarded in percentage of common fund cases generally adhere to a twenty-five to thirty percent "benchmark." Particularly in extremely large recovery cases, percentage recoveries have often been well below twenty-five percent. *See, e.g., In re Cendant Corp. Prides Litig., 243 F.3d at 737* (listing twelve cases in which fees were a smaller percentage of the settlement); *Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52 (2d Cir. 2000)*(affirming fee award of 4 percent of the class recovery and rejecting counsel's objections to the fee as a substantial departure from [*26] the 25 percent "benchmark" in the profession); *In re Dreyfus Aggressive Growth Mutual Fund Litig., 2001 U.S. Dist. LEXIS 8418, 2001 WL 709262 at *4 (S.D.N.Y. June 22, 2001)* (finding 30 percent of a common fund award "at the far end" of reasonableness for securities class actions, and awarding fees amounting to 15 percent of the fund); *In re Fine Host Corp. Sec. Litig., 2000 WL 33116538 (S.D.N.Y. Nov. 8, 2000)* (awarding fees amounting to 17.5 percent of the class recovery). In *Goldberger,* the Second Circuit observed that the asserted 25 percent "benchmark" reflected a contingency risk that was unlikely to be present in every securities fraud class action and held that a 25 percent fee would be unreasonably high in that case, given the absence of a significant risk of nonrecovery. *209 F.3d at 51-52.*

Courts determining what benchmark to use in a particular case, in circuits that formally adopt the percentage of fund method, examine a number of different factors, including: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested [*27] by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. *See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).*

In this case, the fund consists of $ 24.1 million for the PAAP Unit purchasers class and $ 5.4 million for the PRI common stock purchasers class. The nature of the classes makes it possible to say, with assurance, that all those harmed who have filed claims will benefit. There are no objections and virtually no requests for exclusion from the settlement class. The work of the attorneys has largely been out of court, but the speed and quality of the results required both efficiency and effectiveness. The litigation presented complex issues of scienter and causation as to the section 10(b) and section 20 claims and complex issues as to damages with respect to the section 11 claims. The litigation was filed in November

1999 and settled approximately one and one-half years later, a swift resolution for such cases. There is no evident risk of nonpayment. [*28] Although it is difficult to gauge the similarity of other securities cases in aspects relevant to the fees sought and awarded, it appears that the size of the common fund in this case is similar to cases in which fees range from twenty to thirty percent.

Thirty percent is the award the attorneys appeared to contemplate at the time they accepted this case and worked it to a relatively swift, efficient, and successful settlement. *See In re Synthroid Marketing Litig., 264 F.3d 712, 718-19 (7th Cir. 2001)*(discussing "market-based approach" to attorney fees). The claims administration is complete, allowing this court the advantage of knowing that even if the court awards thirty percent of the common fund as fees, the class members with allowable claims will recover the full amount of the allowable claims, net of attorney fees and expenses. In light of all these factors, this court agrees that thirty percent is a percentage that will produce a reasonable fee. This court applies the *Johnson* factors as a lodestar cross-check.

## C. Application of the *Johnson* Factors

The *Johnson* factors are intended to provide the court supervising the settlement and fee with [*29] information to determine that the award is reasonable. *Johnson, 488 F.2d at 720.* While the *Johnson* factors must be addressed, "rarely are all the *Johnson* factors applicable; this is particularly so in a common fund situation." *Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir.1993).* This court examines the reasonableness of an award of thirty percent in light of each of the applicable *Johnson* factors.

### 1. Time and Labor Required

Counsel have submitted summaries of their billing records, representing approximately 4,709.60 hours of work by attorneys in a number of firms. Two of those firms accounted for almost one-half of the hours spent: Milberg Weiss Bershad Hynes & Lerach LLP and Berger & Montague, P.C., the co-chairs of the Plaintiffs' Counsel's Executive Committee. Their work is described as assuming the primary responsibility for research and preparation of the complaint and consolidated complaint; coordinating and directly participating in the witness interviews, document productions, and other informal discovery; negotiating and analyzing the terms of the settlement; and drafting the pleadings, motions, [*30] and documents necessary to achieve the settlement, including the plan of allocation and application for approval. Three other firms, Cauley Geller Bowman & Coates, LLP, Kaplan, Kilsheimer & Fox LLP, and Bernstein Liebhard & Lifshitz, account for another

quarter of the hours expended on this litigation. Their work included researching and drafting initial complaints; searching for the lead plaintiff under the PSLRA; involvement in discovery; participating in key interviews; and coordinating communications with class members. The time expended by the other firms ranged from a low of five hours to approximately one hundred and forty-one hours. The primary work of many of these firms consisted of the initial investigation and filing complaints that were later consolidated, responding to shareholder communications, and reviewing and monitoring subsequent pleadings and documents. The coordination appears to have minimized duplicative involvement in the informal discovery and document production. The hourly rates for attorneys range from a high of $ 615.00 per hour to a low of $ 200.00 per hour for an associate lawyer. The law firms made extensive use of legal assistants, whose hourly rates [*31] ranged from $ 50.00 to $ 150.00. The average hourly rate amounts to $ 354.75; combined with the total number of hours of 4,709.60, the lodestar is $ 1,670,730.60. An award of thirty percent under the lodestar method would require a multiplier of approximately 5.3.

This court will not conduct a detailed analysis of charged hours and hourly rates. To do so would undermine the utility of the percentage fee method. However, this court does note that the hours spent and the average hourly rates are reasonable in light of the circumstances of this case and the results achieved for plaintiffs. Plaintiffs' counsel did not have the benefit of a public investigation or prior litigation and had to rely on their own diligent investigation to build a successful case. Both sides were represented by well known law firms with sophisticated lawyers, and their rates reflect the specialized nature of this type of litigation. Legal obstacles to recovery were significant. Plaintiffs' counsel pursued an aggressive and efficient strategy that culminated in a substantial recovery in a short period of time, saving plaintiffs large sums of money and avoiding the considerable risk and delays of litigation. [*32] This court finds that the time and labor expended was reasonably required for the results achieved in this case.

In using the lodestar method, courts typically apply multipliers ranging from one to four. *Faircloth, 2001 WL 527489 at \*7; In re Harrah's Entertainment, Inc., 1998 WL 832574 at \*5; Combustion, 968 F. Supp. at 1133* (collecting cases). The multiplier can, of course, far exceed that number; counsel have provided a number of examples of such awards. (Docket Entry No. 80, p. 24). This court finds that 5.3 is an acceptable multiplier in light of the particular facts of this case, discussed more fully below.

In contingency fee cases, a multiplier reflects the possibility of no recovery. Because counsel prosecuted this action on a contingent fee basis, this court appropriately focuses on the extent of the risk and the results obtained. An undue emphasis on the number of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and could distort the value of the attorneys' services. *See In re Harrah's Entertainment, Inc., 1998 WL 832574 at \*5.* The applicable *Johnson* factors [*33] support the size of the award in this case.

### 2. Novelty and Difficulty of the Issues

This case raised significant risks as to liability on the section 10(b) and section 20 claims under the Exchange Act. There was significant dispute as to the extent of the defendants' knowledge that one trader was making unauthorized, speculative transactions. Defendants had established measures to prevent the type of trades that led to the losses in this case. The trades violated company policy. Defendants presented information showing that the trades escaped detection because the trader deliberately concealed his activities and intentionally circumvented the controls the company had implemented. There was no insider trading by the individual defendants, removing a basis for proving that these defendants had the requisite scienter during the class period. Proof of scienter under *section 10(b)* and *rule 10b-5* raised significant legal issues and factual complexity, increasing the risk of no recovery as to such claims.

Plaintiffs also sued the individual defendants as controlling persons under *section 20 of the Exchange Act.* Proof as to such claims was complicated because controlling person liability [*34] is subject to a defense of good faith. *Cf. Dennis v. General Imaging, Inc., 918 F.2d 496, 509 (5th Cir.1990); Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111, 1119 (5th Cir.1980).* The factual basis of the individual defendants' good faith defense raised many of the same issues as the proof of scienter under *section 10 and rule 10b-5.*

The section 10 and section 20 claims under the Exchange Act, and the section 11 claims under the *Securities Act of 1933,* also raised significant damages and causation issues. Within approximately one year following the disclosure of the trading losses, the unit price rebounded and erased the decline that followed the disclosure and restatement of the financials. Defendants were prepared to present expert testimony that because of this fact, and because there were other factors unrelated to defendants' conduct that influenced the price during the class period, class members who bought and sold during the class period were not damaged by defendants' conduct. Although the section 11 claims required no proof of scienter, *Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 74 L. Ed. 2d 548, 103 S.*

Ct. 683 (1983), [*35] defendants had significant factual and legal grounds on which to base expert testimony that no damages could be recovered. The rule 10b-5 and section 20 claims not only required proof of scienter, with the risks that entailed in this case, but also included uncertainty as to proving causation and damages.

As a result, this case had significant risks of no recovery or limited recovery. The risks not only support the fairness and adequacy of the settlement that was reached, but also support the use of thirty percent as the basis for a fee award and, in lodestar terms, support a 5.3 multiplier.

### 3. Undesirability of the Case

From the outset, this case was desirable; the quality and number of the firms filing suit shortly after the loss disclosure testifies to that fact. However, the case also carried risks that required investigation and informal discovery to uncover and analyze. There was risk of no recovery. This factor of uncertainty merits an increase in the percentage and, under the lodestar method, speaks directly to the justification for the multiplier.

### 4. Skill Required to Perform the Legal Services Properly; Experience, and Ability of the Attorneys Involved

This court [*36] does not question the legal skill, ability, experience, and resources of plaintiffs' attorneys. Counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution. These factors, considered together with the time and labor required, support the percentage and the lodestar multiplier.

### 5. Preclusion of Other Employment

Plaintiffs' attorneys do not specifically allege any preclusion of other employment due to acceptance of this case. This factor does not influence the fee calculation.

### 6. Customary Fee; Whether Fee is Fixed or Contingent; Amount Involved and Results Obtained; Awards in Similar Cases

Although there is a wide range in common fund fee awards, a majority of common fund fee awards in cases that, like this case, involve large settlements but do not involve the issues raised by "mega" class action settlement amounts, fall between twenty and thirty percent. Plaintiffs' attorneys prosecuted this case on a contingency basis and advanced costs. There was a real risk of no recovery, and significant [*37] uncertainty as to the recovery amounts. In one and one-half years, plaintiffs' attorneys achieved a recovery valued at a total of $ 29.5 million, in cash, for both classes. The claims

file reveals that all allowable claims will be satisfied even after providing the requested fees and reimbursing expenses of $ 187,667.57 in the DiGiacomo case and $ 19,838.63 in the Koplovitz case. The settlement is paid in cash. The settlement allocation has been approved. The fact that this settlement consists of cash, and that the allocation and distribution plan provides assurance that all allowable claims will be fully satisfied, provides significant support for the fee award sought.

### 7. Time Limitations Imposed by the Client or the Circumstances; Nature and Length of the Professional Relationship with the Clients

Plaintiffs' attorneys do not address any time limitations imposed by the clients or the circumstances. Nor do plaintiffs' attorneys discuss the nature and length of their professional relationship with the clients. These factors are inapplicable.

### D. Expenses

No party has objected to the amount of the expenses. Having reviewed the declarations and memoranda submitted [*38] in support, this court finds that the asserted costs are reasonable and awards the full amount of expenses in addition to the percentage fee. See Faircloth, 2001 WL 527489 at *12 (awarding costs in addition to the percentage fee); In re Harrah's Entertainment, Inc., 1998 WL 832574 at *7 (same); Catfish, 939 F. Supp. at 503 (same).

### E. Interest

Plaintiffs' attorneys request interest on fees and expenses. No party has objected to an award of interest. The court awards interest on fees and expenses in the amount actually earned since October 1, 2000.

### F. Final Calculation

Having considered all the Johnson factors, together with the court's award of substantial expenses in addition to the attorney fees, the court determines that a fee should be awarded based on thirty percent of the class settlement fund. In making this award, this court recognizes the results achieved in this case for the class members and the skill of counsel in negotiating a speedy and fair settlement. The other Johnson factors either support the size of the fee awarded or are inapplicable. This court therefore awards total attorney fees in the [*39] amount of $ 7,230,000.00 and expenses of $ 187,667.57 in the DiGiacomo case and attorney fees in the amount of $ 1,620,000.00 and expenses of $ 19,838.63 in the Koplovitz case, with the interest actually earned on the fees and expenses for the same period and at the same rate as that earned on the settlement fund.

SIGNED on December 18, 2001, at Houston, Texas.

4

quently, judgment shall be entered for defendants dismissing the amended complaint.

   SO ORDERED.

---

**[¶ 92,359] Draney v. Wilson, Morton, Assaf & McElligott, et al.**

   United States District Court, District of Arizona. No. Civ. 79-1029. September 30, 1985. Opinion in full text.

   Earlier opinions in this litigation are at '84-'85 Tr. Binder ¶ 91,863; 1984 Tr. Binder ¶ 91,621; 91,463; and 91,462, 1982 Tr. Binder ¶ 98,691; '81-'82 Tr. Binder ¶ 98,338; 1980 Tr. Binder ¶ 97,657; and '79-'80 Tr. Binder ¶ 97,364.

   **Exchange Act—Antifraud—Class Actions—Settlements.**—A class action settlement was approved in connection with a bond offering because, among other things, the settlement will return to class members over three-fourths of the money they paid to purchase the bonds after deduction of all costs and fees and will eliminate the risk that a jury could have found against class members on issues of liability. Also, no objection to the settlement had been filed by any class member.

   See ¶ 22,721 and 22,725, "Exchange Act—Manipulations; National Market System" division, Volume 3.

   R. Alan Stotsenburg, P.C., R. Alan Stotsenburg and David C. Harrison, New York, N.Y.; and, Evans, Kitchel, & Jenckes, P.C., F. Pendleton Gaines, Alvin H. Shrago and Katharine M. Harmeyer, Phoenix, Ariz., for plaintiff Charles T. Draney and the Bondholder Class.

   Rogers & Wells, Mitchell L. Lathrop and Terrence L. Bingman. San Diego. Cal.; and, Jennings, Strouss & Salmon, John G. Sestak, Phoenix, Ariz., for bond counsel defendants.

   David S. Shughart, Phoenix, Ariz., for defendants Pinal County, Arizona; Mountainview Estates County Improvement District; and Jay Bateman, County Administrator.

   O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Donald E. Dykeman, Phoenix, Ariz., for IPI of Arizona, Inc., IPI Community Builders and Jerry Tokoph.

   Gallagher & Kennedy, Kevin E. O'Malley, Phoenix, Ariz., for defendants Stanfield, McCarville.

   Brown & Bain, P. A.C. Randall Bain, Phoenix, Ariz., for defendants T.E.S. Farms and David Rich.

   Opinion of HARDY, District Judge.

   This matter having come on for hearing on September 30, 1985, pursuant to notice to the parties, Charles T. Draney, individually and as representative of a bondholder class ("Plaintiff"), Wilson Jones Morton & Lynch, Wilson Morton Assaf & McElligott, Ernest and Marjorie Wilson, Gerald and Jo Laster, Kenneth and Judy Jones, Andrew and Catherine Hall, James T. Morton, Nancy J. Roth, Estate of Peggy L. McElligott ("Bond Counsel Defendants"); TES Farms, David and Edra Rich ("TES Farms Defendants"); IPI of Arizona, Inc., IPI Community Builders, Inc., Jerry and Gudrun Tokoph ("Developer Defendants"); Pinal County, Mountainview Estates County Improvement District and Jay and Mary Bateman ("the Pinal County Defendants"); and Stanfield McCarville Coxon Cole & Fitzgibbons, Stanfield McCarville Coxon & Cole, Thomas and Josephine McCarville ("the Local Counsel Defendants") (all defendants collectively referred to as "Settling Defendants") and class members to determine the fairness, reasonableness, and adequacy of the proposed compromise and settlement of this action as embodied in the Settlement Agreement dated June 21, 1985,

Plaintiff and the Settling Defendants having requested the approval of the Court of the terms and conditions of the Settlement Agreement pursuant to Rule 23(e), *Fed.R.Civ.P.*, and appropriate notice having been given to the class thereof, the Court having considered the entire court file, including the pleadings, extensive discovery including numerous depositions, voluminous documents and records produced, all motions previously decided or presently before the Court, any affidavits, exhibits, testimony and arguments of counsel submitted in connection herewith, having heard from or offered an opportunity to all interested persons who appeared at the hearing or who have made written submissions to the Court, does hereby make the following findings of fact and conclusions of law pursuant to Rule 52, *Fed.R.Civ.P.*, and enters the following final order approving settlement and, by separate instrument, the contemporaneous Final Judgment and Dismissal, as follows:

   1. The settlement of this class action reached among Plaintiff and Settling Defendants is embodied in the Settlement Agreement. Under Rule 23, *Fed.R.Civ.P.*, this class action cannot be dismissed or compromised without the

approval of the Court. Pursuant to this rule, the authority to approve the settlement is left the sound discretion of the trial court.

2. The Ninth Circuit has recently reiterated the guidelines for determining the adequacy of settlement terms in a class action in *Officers for Justice v. Civil Service Commission of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1985):

> Although Rule 23(e) is silent respecting the standard by which a proposed settlement is to be evaluated, the universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable. [cases omitted] The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. [cases omitted] This is by no means an exhaustive list of relevant considerations, nor have we attempted to identify the most significant factors. The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, and the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.

688 F.2d at 625.

3. In applying the above factors to this proposed settlement, the Court has also considered the judgment of experienced counsel and the presence of good faith bargaining among the contending parties. Courts have consistently refused to substitute their business judgment for that of counsel absent evidence of fraud or overreaching. *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971). Compromise is the essence of settlement and the Court should not make the proponents of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of which concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes.

4. It is inappropriate for this Court to reach any ultimate conclusions on the contested issues of fact and law because the very uncertainty of outcome in litigation and the avoidance of wasteful and expensive litigation are two factors that induce consensual settlements. *Officers for Justice, supra*, 688 F.2d at 625. The following

discussion sets forth some of the disputed factual aspects about this case which would make the outcome of a trial uncertain and which weigh in favor of the settlement.

5. *The Strength of Plaintiff's Case.*

The principal strengths of plaintiff's case were: (1) with respect to the 1974 bonds, there was no disclosure of the fact that the statute pursuant to which the bonds were issued had been declared unconstitutional by the Superior Court because of its defective title and (2) with respect to the 1976 bonds, the developer had been unsuccessful with the development and was in serious financial difficulty. However, these strengths were counterbalanced by the facts that, (1) in 1975, the Arizona legislature addressed the constitutional defect in the bond statute and enacted curative legislation validating the 1974 bonds and (2) the Wilson Jones law firm prepared —"Official Statements" for the 1976 bonds (which were distributed to the underwriter) that disclosed the problems with the development and the developer's precarious financial position. Whether a jury would have found the nondisclosure of the *White v. Kaibab* unconstitutionality decision material in light of the curative legislative enacted one year later or that the defendants did not discharge their duty of disclosure by disclosing adverse facts to the underwriter is speculative. The point is, however, that a jury could have ruled either way on these two central issues.

6. *The Risk, Expense, Complexity, and Likely Duration of Further Litigation.*

Although plaintiff had plausible claims against the defendants, the case was by no means open and shut. A jury could have ruled in favor of defendants, who did have plausible evidence to counter plaintiff's principal claims of materiality and non-disclosure. This was a significant risk that has been totally eliminated by the settlement.

Even if the jury returned a verdict in favor of the class on class issues of liability, it is doubtful whether the class members would receive any significantly greater benefit than they are receiving under this settlement. First, the defendants would be entitled to try the individual issues (such as statutes of limitations, reliance, causation, recklessness of class members and damages), which could take a long time. Second, It is conceivable that defendants might be able to prevail on some of these individual issues, in which case the claims of some class members would be defeated in their entirety. Third, defendants could have appealed the case to the Ninth Circuit if they were dissatisfied at the conclusion of the trial court proceedings. Further proceedings could have meant years of delay before the class members received any of their money back (assuming that they still pre-

©1985, Commerce Clearing House, Inc.

vailed after an appeal). This is an important consideration since many class members are elderly persons who do not have the luxury of time.

In addition, a full-blown trial would have been very expensive. Defendants had advised the Court that they did not believe the trial on the class issues could be concluded in six weeks. Given the hundreds of exhibits that defendants were prepared to offer in evidence, the trial on just the class issues could have lasted many months. If defendants were found liable on the class issues, the trial of the individual issues could have taken several more months. It is questionable whether the added expense would have produced any additional benefit for the class.

The principal benefit that the class could hope to achieve from a favorable jury verdict would be the recovery of pre-judgment interest and punitive damages. However, an award of pre-judgment interest under the federal securities laws is discretionary; the Ninth Circuit has upheld a district court's refusal to award pre-judgment interest on claims arising out of investments which have tax benefits. *E.g., Burgess v. Premier Corp.,* 727 F.2d 826, 838 (9th Cir. 1984). A denial of pre-judgment interest could have resulted in a lower benefit to the class than what it is presently receiving by way of the settlement.

The availability of punitive damages was hotly contested. It is clear that they are not available under the federal securities laws. It is unclear whether they are available under the Arizona Securities Act. Any award of punitive damages would be highly speculative, especially since the Court had denied plaintiff's request for discovery of the financial data they believed to be necessary in seeking punitive damages.

### 7. *The Risk of Maintaining Class Action Status Throughout the Trial.*

Defendants' repeated challenges of Mr. Draney's ability to represent the 1974 bondholders after his own 1974 bonds had been redeemed were repeatedly rejected by the Court. Accordingly, there was not much of a risk in maintaining class action status throughout the trial.

### 8. *The Amount Offered in Settlement.*

As previously stated, the $2,600,000 paid by defendants to settle this case exceeds the $2,335,000 face value amount of the outstanding bonds. The claims submitted by the class members reflect a total out-of-pocket loss of $2,160,261.12. See page 32 of Exhibit "A" attached to the Third Addendum to Report by Plaintiff's Counsel on Class Member Claims. This is the amount of damages that the class members probably would have received if they had been fully successful at the trials on both the class and individual issues, assuming that

the Court exercised its discretion to deny any award of pre-judgment interest and that no punitive damages were awarded.

### 9. *The Extent of Discovery Completed, and the Stage of the Proceedings.*

All discovery has been completed for quite some time; the case was settled on the eve of trial after the Court had conducted eight days of a pretrial conference. Extensive discovery has allowed the Court an excellent evidentiary basis upon which to decide whether the settlement is fair. Furthermore, settlement at this stage obviates the need for lengthy and expensive trial (and possibly appellate) proceedings which might well diminish any net recovery to the class.

### 10. *The Experience and Views of Counsel.*

It is the view of experienced counsel that the proposed settlement is an excellent result for the class. The Court agrees. While it is possible that a larger gross recovery could be obtained if the class were fully successful at trial on all class and individual issues (and assuming both pre-judgment interest and punitive damages were awarded), it is likely that the additional expenses of trying this case would offset any augmentation in the gross recovery. This settlement (a) gives the class members a larger out-of-pocket loss recovery than they might have recovered after an extensive trial, (b) eliminates the risk that a jury could have found for defendants on any class issues of liability or on some individual issues, and (c) makes the recovery available to the class members now as opposed to after possibly years of post-trial proceedings and appeals.

### 11. *The Presence of a Governmental Participant.*

To the extent this factor relates to the presence of a governmental participant as a prosecutor, it is inapplicable. Although the Securities and Exchange Commission did conduct an investigation, it did not prosecute or initiate any proceedings against any of the defendants in this case.

### 12. *The Reaction of the Class Members to the Proposed Settlement.*

No class member has filed any objections to the settlement. Only five class members have excluded themselves from the class. Of those five, four are persons who apparently purchased their bonds after the default.

#### *Conclusion*

The settlement in this case came after five and a half years of vigorously litigated claims and defenses. It will return to the class members, after deduction of all costs and attorneys' fees requested by plaintiff's counsel and